AUSA: Ronald W. Waterstreet          Telephone: 313 226-9593

Special Agent    : Thomas Huse - FBI     N W I     Telephone: 313 965-2323

AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Eastern District of Michigan

**ORIGINAL**

United States of America,

Plaintiff,

v.

Mohammad Hassan Hamdan

Defendant(s).

Case: 2:14-mj-30120
Judge: Unassigned,
Filed: 03-17-2014 At 01:46 PM
usa v. Mohammad Hassan Hamdan(CMP)(
MLW)

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief:

On or about the date(s) of <u>September 2013 through March 16, 2014</u>, in the county of <u>Wayne</u> in the <u>Eastern</u> District of <u>Michigan</u>, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. Section 2339B(a)(1) | Providing or attempting to provide material support to a foreign terrorist organization. |

This criminal complaint is based on these facts:

See attached Affidavit

☑   Continued on the attached sheet.

_Complainant's signature_

Thomas Huse - Special Agent of the FBI
_Printed name and title_

Sworn to before me and signed in my presence.

Date: <u>March 17, 2014</u>

City and state:  <u>Detroit, Michigan</u>

_Judge's signature_

R. Steven Whalen
_Printed name and title_

## AFFIDAVIT

I, Thomas S. Huse, being duly sworn, depose and state that:

## Background

1. I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed for approximately three and a half years. I am presently assigned to the FBI Detroit Joint Terrorism Task Force (JTTF) to work a variety of national security and criminal matters. Upon joining the FBI, I received five months of training in law enforcement investigative techniques, including the investigation of national security and other criminal matters. Prior to becoming a Special Agent, I received a Bachelor of Science in Justice Systems from Truman State University, after which I served in the U.S. Army for over six years and worked in business administration for over three years.

2. The information contained in this affidavit is a combination of this affiant's personal knowledge of this investigation, information obtained from duly sworn law enforcement officers or agents, FBI records, and information obtained from third-party witnesses.

3. I make this affidavit in support of a criminal complaint regarding the criminal activity of MOHAMMAD HASSAN HAMDAN (hereinafter HAMDAN).

4. The information contained in this affidavit is submitted for the purpose of demonstrating probable cause that HAMDAN has attempted to provide material support or resources to a designated foreign terrorist organization in violation of 18 U.S.C. Section 2339B(a)(1).

5. Because this affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not contain all the information known to me and/or other law enforcement officers involved in this case.

### Historical Background

### Foreign Terrorist Organizations

6. Under the Anti-Terrorism and Effective Death Penalty Act (AEDPA), the Secretary of
   State is empowered to designate groups as a "foreign terrorist organization" (FTO). 8
   U.S.C. § 1189(a)(1). FTOs are designated by the Secretary of State in accordance with
   section 219 of the Immigration and Nationality Act (INA). Entities are designated as
   FTOs if the Secretary finds (A) the organization is a foreign organization; (B) the
   organization must engage in terrorist activity, as defined in section 212 (a)(3)(B) of the
   INA (8 U.S.C. § 1182(a)(3)(B)), or terrorism, as defined in section 140(d)(2) of the
   Foreign Relations Authorization Act, Fiscal Years 1988 and 1989 (22 U.S.C. §
   2656f(d)(2)), or retain the capability and intent to engage in terrorist activity or terrorism;
   and (C) the organization's terrorist activity or terrorism must threaten the security of U.S.
   nationals or the national security (national defense, foreign relations, or the economic
   interests) of the United States." Id. Effective October 8, 1997, then Secretary of State
   Madeleine Albright designated as a foreign terrorist organization Hizballah, a.k.a. "Party
   of God," a.k.a. "Islamic Jihad," a.k.a. "Islamic Jihad Organization," a.k.a. "Revolutionary
   Justice Organization," a.k.a. "Organization of the Oppressed on Earth," a.k.a. "Islamic
   Jihad for the Liberation of Palestine," a.k.a. Organization of Right Against Wrong," a.k.a.
   "Ansar Allah," a.k.a. "Followers of the Prophet Muhammad." Designation of Foreign
   Terrorist Organizations, 62 Fed. Reg. 52,650, 52,650-1 (1997)

7. Hizballah's terrorist attacks have included the suicide truck bombings of the U.S.
   Embassy and U.S. Marine barracks in Beirut in 1983; the U.S. Embassy annex in Beirut
   in 1984; and the 1985 hijacking of TWA flight 847, during which a U.S. Navy diver was

murdered. Elements of the group were responsible for the kidnapping, detention, and murder of Americans and other Westerners in Lebanon in the 1980s. Hizballah also was implicated in the attacks on the Israeli Embassy in Argentina in 1992 and on the Argentine-Israeli Mutual Association in Buenos Aires in 1994. In 2000, Hizballah operatives captured three Israeli soldiers in the Sheba'a Farms area and kidnapped an Israeli non-combatant. Since at least 2004, Hizballah has provided training to select Iraqi Shia militants, including the construction and use of shaped charge improvised explosive devices (IEDs) that can penetrate heavily-armored vehicles. A senior Hizballah operative, Ali Mussa Daqduq, was captured in Iraq in 2007 while facilitating Hizballah training of Iraqi Shia militants. In July 2006, Hizballah attacked an Israeli Army patrol, kidnapping two soldiers and killing three, starting a conflict with Israel that lasted into August. Since the February 2008 killing in Damascus of Imad Mughniyah, the Hizballah terrorist and military chief suspected of involvement in many attacks, senior Hizballah officials have repeatedly made public statements blaming Israel for the killing and vowing retaliation. In a two-week period in May 2008, Hizballah's armed takeover of West Beirut resulted in more than 60 deaths. In November 2009, the Israeli navy seized a ship carrying an estimated 400-500 tons of weapons originating in Iran and bound for Hizballah, via Syria.

8. This worldwide terrorist organization is centered in the south of Lebanon, composed of Shiite Muslims, dominated by and allied with Iran, and headed by its Secretary General Hassan Nasrallah. Hizballah supports the model of the Iranian Islamic Republic and promotes the realization of this form of government worldwide. Hizballah's goals include the eradication of "western imperialism" from the Middle East represented in part

by the United States ("the Great Satan") and Israel ("the little Satan"). Hizballah is an avowed enemy of the United States as evidenced by, among other things, the open declarations of Secretary General Hassan Nasrallah: "Our slogan was, our slogan is still today, and our slogan will remain, 'Death to America.'"

9. The AEDPA also extended criminal liability to those who provide "material support or resources" to designated foreign terrorist organizations. 18 U.S.C. § 2339B. Material support or resources is broadly defined as:

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safe houses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1).

10. Hizballah Secretary General Hasan Nasrallah publically indicated in May 2013 that Hizballah was supporting Bashar al-Asad's regime by sending fighters to Syria.

## Criminal Conduct

11. On September 12, 2013, an FBI Confidential Human Source (hereinafter referred to as SOURCE 1) informed the FBI that an individual identified as MOHAMMAD HASSAN HAMDAN wanted to travel to Syria by Christmas 2013 in order to fight alongside Hizballah. HAMDAN revealed that he could not leave, because his Lebanese passport was being held by his sister, HANAN HAMDAN. HAMDAN also said that his sister, who knew that he wanted to go to fight with Hizballah, was trying to prevent that from happening by keeping his Lebanese passport.

12. In an attempt to confirm this information, your affiant sought information regarding HAMDAN, including HAMDAN's presence in the United States. After contacting the United States Department of Homeland Security (DHS), your affiant learned that HAMDAN, who was born in Lebanon on December 18, 1991, is a Lawful Permanent Resident (LPR) who came to the U.S. in June of 2007.

13. Further investigation revealed that HAMDAN has sought to change his status from that of a LPR to become a naturalized United States citizen. According to documents provided from DHS, on November 11, 2013, HAMDAN filed an application to become a U.S. citizen (DHS form N-400 Application for Naturalization). In that document HAMDAN confirmed he was a Lebanese national. To ensure the naturalization of people the United States deems to be appropriate, any applicant must swear allegiance to the United States, and swear that he or she has not "ever been a member of or in any way associated (either directly or indirectly) with a terrorist organization." HAMDAN swore under penalty of perjury that he had never been associated with any terrorist organization. However, he has made several comments to SOURCE 1 that would make his sworn statements on his DHS N-400 knowingly false.

14. On January 28, 2014, the FBI conducted a consensually recorded conversation between HAMDAN and SOURCE 1. During the consensually recorded conversation HAMDAN discussed his intent to go to Lebanon for the purpose of assisting Hizballah in its efforts in the war in Syria. Further, HAMDAN also indicated that would seek to become an active member of Hizballah. HAMDAN further told SOURCE 1 that HAMDAN had previously been active within the Hizballah ranks during the war with Israel in 2006, one year prior to his immigration to the U.S. He also stated that he had been involved with

Hizballah's program of distribution and public assistance as a youth before coming to the U.S. HAMDAN admitted to SOURCE 1 that he had received military training from Hizballah. HAMDAN added that Hizballah's military training begins at a very early age and includes training on operating various weapons systems. During the conversation HAMDAN stated to SOURCE 1 that his purpose in traveling to Lebanon and joining Hizballah was to fight in support and with Hizballah in Syria in the present conflict. Specifically, Hamdan stated he would be paid between $500 and $1,000 per month by "the party" (meaning Hizballah) to fight in Syria. He also stated, "I am leaving behind a family . . . My uncles tried to convince me [to not go to Syria] . . . but this is my decision and no one else's . . ."

15. HAMDAN stated that the timing of his trip to Lebanon would depend on his ability to obtain either a Lebanese passport or a U.S. passport, since his sister took his passport. To obtain a replacement Lebanese passport, HAMDAN stated that he would be required to advertise the loss of his original passport in a local newspaper for a period of two weeks prior to applying for the replacement. Regarding the U.S. passport, HAMDAN told SOURCE 1 that he had applied for U.S. citizenship and was in the final stages of the citizenship process. Your affiant learned that HAMDAN's statement to SOURCE 1 is consistent with the information your affiant learned from the DHS and HAMDAN's N-400 concerning HAMDAN'S attempt to become a U.S. citizen.

16. On January 9, 2014, SOURCE 1 reported to the FBI that HAMDAN had received a telephone call, most likely during the week of December 30, 2013, from an individual in Lebanon who told HAMDAN he could come to Lebanon in May 2014 and join

Hizballah. According to SOURCE 1, HAMDAN was elated that he was going to be allowed to join Hizballah.

17. In an effort to further corroborate the information received by SOURCE 1, the FBI made an inquiry with the Dearborn Heights Police Department and learned that on March 4, 2014, HAMDAN filed a report with the Dearborn Heights Police Department stating that he had recently lost his Lebanese passport and needed to report his lost passport as lost and/or missing in order to apply for a temporary passport. Additionally, HAMDAN stated that he wanted to travel overseas and would apply for another passport when he got to Lebanon. Your affiant believes that this report may have been filed by HAMDAN in response to a requirement imposed upon him by the Lebanese government, establishing the loss of the passport, prior to their issuance of a new Lebanese passport.

18. On March 15, 2014, the FBI received information that HAMDAN had booked a flight to Lebanon. According to information provided to the FBI, HAMDAN was scheduled to depart Detroit, Michigan at 10:30pm on March 16, 2014, on Air France flight number 378, and arrive in Paris, France at 11:27am on March 17, 2014. Additionally, HAMDAN was scheduled to depart Paris, France at 1:40pm on March 17, 2014 on Air France flight number 568 and arrive in Beirut, Lebanon at 6:55pm on March 17, 2014. HAMDAN's flight itinerary indicated he was scheduled to travel on May 3, 2014 from Beirut, Lebanon to Detroit, Michigan via Paris, France on Air France flight numbers 569 and 378.

19. While the purchasing of a round trip ticket would seem to indicate that HAMDAN plans to return to the U.S. in May 2014, HAMDAN's statements and actions, as well as recently developed information, place some doubt upon his intent to return to the U.S.

For example, on March 15, 2014, your affiant learned that HAMDAN had given ownership of his vehicle to his sister. Additionally, your affiant learned that HAMDAN asked SOURCE 1 on March 15, 2014, to sell his work van for him and to give the money to his family.

20. On March 15, 2014, HAMDAN had called Source-1 and stated that he wanted to meet to say goodbye. The meeting took place on March 16, 2014, and an audio and video recording was made by the FBI with the consent of SOURCE-1. The meeting lasted for approximately fourteen minutes. The conversation took place in the Arabic language, but an FBI Language Specialist has reviewed the recording and has provided a summary of what was discussed. HAMDAN and Source-1 discussed three main topics: 1) Why HAMDAN was planning to leave now, when he previously had planned to depart in May; 2) the fact that the United States government designates Hizballah as a terrorist organization; and 3) how HAMDAN had obtained the necessary funds.

21. In the conversation, SOURCE-1 stated that the United States government considers Hizballah a terrorist organization. SOURCE-1 stated that it was likely that HAMDAN would become known by fighting in Syria, and that as a result it would not be possible for him to return to the United States, because he would be arrested by United States authorities upon his return. HAMDAN stated that he did not think he would get in trouble if he came back to the United States but that he did not intend to come back in any event.

22. On March 16, 2014, HAMDAN was detained at the Detroit Metropolitan Airport after clearing the TSA security checkpoint but prior to boarding the flight. Agents spoke with HAMDAN after giving him *Miranda* warnings. During the ensuing conversation,

HAMDAN denied any plans to join Hizballah or to fight in Syria. Further he denied ever telling anyone that he planned to join Hizballah or to fight in Syria, instead saying that the purpose of his trip to Lebanon was to have dental work done.

23. Based upon the forgoing your affiant considers there is probable cause to believe that MOHAMMAD HASSAN HAMDAN is attempting to provide material support to a foreign terrorist organization by offering personnel, specifically himself, in violation of 18 United States Code Section 2339B.

THOMAS S. HUSE
Special Agent
Federal Bureau of Investigation

Subscribed and sworn before me on this 17th day of March, 2014.

MONA K. MAJZOUB  R. Steven Whalen
United States Magistrate Judge