1    **UNITED STATES DISTRICT COURT**
     **EASTERN DISTRICT OF MICHIGAN**
2              **SOUTHERN DIVISION**

3    **UNITED STATES OF AMERICA,**

4                    Plaintiff,        **Case No. 14-30120**
          **-v-**
5
     **MOHAMMAD HASSAN HAMDAN,**
6
                    Defendant.
7    _____/

8                    **DETENTION HEARING**

9          BEFORE THE HONORABLE **R. STEVEN WHALEN**
           United States Executive Magistrate Judge
10         Theodore Levin United States Courthouse
                231 West Lafayette Boulevard
11                 Detroit, Michigan
                   **March 25, 2014**
12
     **APPEARANCES:**
13
     FOR THE PLAINTIFF:   **RONALD W. WATERSTREET**
14                        U.S. Attorney's Office
                          211 W. Fort Street
15                        Suite 2001
                          Detroit, MI 48226
16

17   FOR THE DEFENDANT:   **ARTHUR J. WEISS**
                          30445 Northwestern Highway
18                        Suite 330
                          Farmington Hills, MI 48334-3102
19

20           **To Obtain a Certified Transcript Contact:**
     Christin E. Russell, RMR, CRR, FCRR, CSR - (248) 420-2720
21         Proceedings produced by mechanical stenography.
         Transcript produced by computer-aided Transcription.
22

23

24

25

I N D E X

DETENTION HEARING                                          Page

WITNESSES FOR THE GOVERNMENT:
**THOMAS HUSE**
DIRECT EXAMINATION BY MR. WATERSTREET              5
CROSS-EXAMINATION BY MR. WEISS                    25
REDIRECT EXAMINATION BY MR. WATERSTREET           46
RECROSS-EXAMINATION BY MR. WEISS                  47

**HIBA HAMDAN**
DIRECT EXAMINATION BY MR. WEISS                   55
CROSS-EXAMINATION MR. WATERSTREET                 61

**HUSSEIN AWDA**
DIRECT EXAMINATION BY MR. WEISS                   69
CROSS-EXAMINATION BY MR. WATERSTREET              73
REDIRECT EXAMINATION BY MR. WEISS                 76

**ALI MOUNZER**
DIRECT EXAMINATION BY MR. WEISS                   78
CROSS-EXAMINATION BY MR. WATERSTREET              81
REDIRECT EXAMINATION BY MR. WEISS                 88

**HANAN ABBOUD**
DIRECT EXAMINATION BY MR. WEISS                   90
CROSS-EXAMINATION BY MR. WATERSTREET              99
REDIRECT EXAMINATION MR. WEISS                   113

Argument by Mr. Waterstreet                      115
Argument by Mr. Weiss                            121
Response by Mr. Waterstreet                      128

E X H I B I T S

(None Offered.)

CERTIFICATE OF REPORTER                          132

```
 1   Detroit, Michigan
 2   March 25, 2014
 3   12:25 p.m.
 4                    *            *            *
 5        THE CLERK:  The Court calls case No. 14-30120.  United
 6   States of America vs. Mohammad Hamdan.
 7        MR. WATERSTREET:  Good afternoon, your Honor.  Ronald
 8   Waterstreet appearing on behalf of the United States.
 9        MR. WEISS:  Good afternoon, your Honor.  May it please
10   the Court, Arthur Weiss on behalf of Mr. Hamdan.
11        THE COURT:  Good afternoon.  We commenced briefly a
12   detention hearing yesterday.  The Government proffered the
13   Pretrial Services' report.  And I understand, Mr. Waterstreet,
14   you have a witness as well?
15        MR. WATERSTREET:  Yes.  Yes, I do, your Honor.  But if
16   I may just point a few things out in the Pretrial Services'
17   report?
18        THE COURT:  Actually, why don't you save that for
19   argument.  Every word of this report is in evidence right now.
20        MR. WATERSTREET:  Okay.
21        THE COURT:  Okay.
22        MR. WATERSTREET:  Your Honor, I intend to call --
23        THE COURT:  Mr. Weiss, you can have a seat at the
24   table with your client.  I'm sorry.  Go ahead.
25        MR. WATERSTREET:  I intend to call Agent Huse to the
```

```
 1    stand.  And before I do that, your Honor, I just want to make
 2    sure that the issue concerning the, the identity of the
 3    confidential informant, our source, is not going to be an issue
 4    that's going to be revealed, nor can be an issue that can be
 5    sought to be revealed at this, at this juncture.  The Supreme
 6    Court has talked to that.  And I just want to make sure that
 7    the ground rules are clear on that; that we're not going to be
 8    wasting our time trying to delve into the identity of the
 9    source.
10            THE COURT:  Do you have any issue with that, Mr.
11    Weiss?
12            MR. WEISS:  I don't plan on asking the FBI agent the
13    source's name, if that's what Mr. Waterstreet is concerned
14    about.
15            MR. WATERSTREET:  Or, you know, those range of
16    questions that we --
17            THE COURT:  Let's move forward and deal with it on a
18    question-by-question basis.
19            MR. WATERSTREET:  All right.  The United States call
20    Agent Huse to the stand, your Honor.
21            THE COURT:  Mr. Huse, raise your right hand, please.
22            (Witness is sworn.)
23            THE COURT:  Take the stand.  And if you would state
24    and spell your name for the record, please.
25            THE WITNESS:  Yes, sir.  Thomas Huse.  H-U-S-E.
```

```
 1              THE COURT:  Go ahead, Mr. Waterstreet.
 2              MR. WATERSTREET:  Thank you very much, your Honor.
 3                          THOMAS HUSE
 4    called as a witness at 12:28 p.m., testified as follows:
 5                       DIRECT EXAMINATION
 6  BY MR. WATERSTREET:
 7  Q.  Where are you employed, sir?
 8  A.  I'm employed with the FBI.
 9  Q.  And how long have you been so employed?
10  A.  Approximately three and a half years.
11  Q.  And are you in any particular unit within the FBI?
12  A.  Yes.  I work for the Detroit division.
13  Q.  And within the Detroit division, are you assigned to the
14  Detroit Joint Terrorism Task Force?
15  A.  Yes, I am.
16  Q.  Okay.  And I want to ask you, are you one of the agents
17  involved in the investigation of Mr. Hamdan?
18  A.  Yes, I am.
19  Q.  All right.  Let me ask you, do you speak Arabic at all?
20  A.  No, I do not.
21  Q.  Were you part of the translation of any of the recordings
22  that were made in this case?
23  A.  No, sir, I was not.
24  Q.  Were you part of preparing any of those?
25  A.  No, sir.
```

THOMAS HUSE - DIRECT

1  Q.  Can you explain just real briefly to the Court, the process
2  that you go through, if you have, let's say, an Arabic
3  recording, what you do within the office?
4  A.  Yes.  What we would do once we receive that recording,
5  after we've made copies and turned that into the proper
6  evidence personnel, we then turn a working copy over to our
7  Language Services Department, at which time they go through and
8  begin making either a summary translation or a verbatim
9  translation.
10 Q.  Okay.  And do you have input in that, you say, such as we
11 want you to make sure that the defendant says this as part of
12 your translation, or anything of that nature?
13 A.  No, sir.  We just give them the overall case information as
14 far as administrative case numbers, and then request whether
15 it's going to be a summary translation or a verbatim.
16 Q.  So you would not be able to say whether the translation was
17 accurate or inaccurate, or that it's been modified because of
18 something you've, you've requested, correct?
19 A.  That's correct.
20 Q.  All right.  Well, I think I may have misspoke.
21        You have not asked them to make any modifications or
22 changes in order to, to reflect a particular statement or
23 anything of that?
24 A.  No.  The only time we have questions is if we, so that we
25 don't understand, we ask for more information.

1  Q.  Okay.  So let's, let's turn to some time back in, in

2  September of this past year, of 2013.

3          Did a source provide information to your office

4  concerning Mr. Hamdan?

5  A.  Yes.

6  Q.  And without going into too, too great a detail, can you

7  give us a flavor of what that type of information was?

8  A.  Yes.  The source stated that Mr. Hamdan had told him that

9  he planned to go to Syria to fight with Hizballah around

10 Christmas or December of 2013.

11         He explained that he wouldn't be able to go because

12 his passport was being held by his sister, who did not want him

13 to travel.

14 Q.  Okay.  And that that was the information that you were

15 provided?

16 A.  That's correct.

17 Q.  Now, Hizballah has been designated by the United States as

18 a foreign terrorist organization, correct?

19 A.  That is correct.

20 Q.  And to be a member of that, or to aid or assist them in any

21 way, is a federal crime?

22 A.  That is correct.

23 Q.  All right.  So did you do some follow-up on that?

24 A.  Yes.

25 Q.  What did you find out about whether the defendant was a

```
 1    U.S. citizen, born here in the United States, or whether he had
 2    come here to the United States?
 3    A.  We requested records through Immigration.  We received his
 4    N-400 application for naturalization back, which indicated that
 5    he was currently a legal permanent resident; that he was born
 6    in Lebanon, December 18th, 1991; and that he had come to the
 7    U.S. initially in June of 2007.
 8    Q.  And he was applying to become a U.S. citizen?
 9    A.  That is correct.
10    Q.  Some time in November of 2013?
11    A.  Yeah.
12    Q.  Approximately?
13    A.  That is correct.
14    Q.  And one of the questions in that form is that have you ever
15    been a member or associated in any way, either directly or
16    indirectly, with a terrorist organization.
17    A.  Yes, sir, that question is in there.
18    Q.  Okay.  And he answered "no" to that, as best you recall?
19    A.  Correct.
20    Q.  Did there come a point in time some time in December,
21    excuse me, in January of this year, that a meeting took place
22    between the defendant and the source?
23    A.  Yes.
24    Q.  And was this a little bit more of a lengthier discussion?
25    A.  It was.
```

 1   Q.   Was this conversation recorded?

 2   A.   It was.

 3   Q.   And you provided copies of those recordings of January to

 4   the United States, correct?

 5   A.   That is correct.

 6   Q.   To our office?

 7   A.   Yes, sir.

 8   Q.   And we provide those to defense, as far as you know?

 9   A.   As far as I know, yes.

10   Q.   As well as you had transcripts from that meeting made

11   pursuant to the outline you've provided earlier, about the,

12   using the linguists?

13   A.   That is correct.

14   Q.   And those likewise were provided to defense?

15   A.   As far as I am aware, yes.

16   Q.   Again, without going into any great detail at this

17   particular moment, were there conversations about the defendant

18   traveling to the Middle East to join Hizballah and to engage in

19   any fighting on their behalf?

20   A.   Yes.

21   Q.   Can you explain roughly what some of that information was?

22   A.   If I may refer to the transcripts?

23   Q.   Sure.

24   A.   Okay.

25   Q.   Absolutely.

THOMAS HUSE - DIRECT

1  A.  This is the transcript of the recording that was conducted

2  on January 28th.

3        MR. WATERSTREET:  Does the Court still have a copy?

4        THE COURT:  I do.

5        MR. WATERSTREET:  Okay.

6  BY MR. WATERSTREET:

7  Q.  And for our benefit, if you need to -- if you could refer

8  to a page.

9  A.  Okay.

10  Q.  It would probably help the Court, too.

11  A.  Yes.  I'll be beginning on page 12.

12  Q.  Okay.

13  A.  "Source:  Yeah, yours has 99,000 miles on it.  Yours has

14  navigation.  This makes a difference.  Some of them come with

15  navigation.  What did you do?  Are you still willing to go down

16  there?"

17  Q.  Now, what is that -- what, from your discussion or your

18  understanding of this case, what were they talking about the

19  navigation with 99 --

20        MR. WEISS:  Your Honor, I'm going to interpose an

21  objection.  It's my understanding based on Mr. Waterstreet's

22  questioning of this individual that he didn't -- he doesn't

23  understand Arabic.  He did not participate in the translation.

24  And so it would be like you or anyone else just reading off a

25  piece of paper and then trying to opine as to what someone else

THOMAS HUSE - DIRECT

1    meant or didn't mean on the basis of that.

2           There's no foundation that this individual either has

3    gotten into the mind or thinking processes of either Mr. Hamdan

4    or the source.  So it could be just anyone reading a piece of

5    paper and speculating as to what was intended by that.

6           I think if anyone is going to make any conclusions,

7    with all due respect, it should be the Court rather than the

8    agent.

9           THE COURT:  What's your specific question, Mr.

10   Waterstreet?

11          MR. WEISS:  There is no foundation that this gentleman

12   is clairvoyant or that he's able to ascertain what was said

13   because --

14          THE COURT:  I understand.  What's your specific

15   question, Mr. Waterstreet?

16          MR. WATERSTREET:  I was just trying to give the Court

17   a little bit of some, some background.

18          THE COURT:  No.  But what is your specific question at

19   this point?

20          MR. WATERSTREET:  The question is do you know what

21   they were talking about when "yours has 99,000 miles on it.

22   Yours has navigation?  This makes a difference."

23          THE COURT:  I'll sustain the objection.  That would

24   be, that would be speculative.  You can -- if you can lay a

25   foundation.

 1            MR. WATERSTREET:  I'll be more than happy to.

 2            THE COURT:  Yeah.

 3   BY MR. WATERSTREET:

 4   Q.  As far as this conversation, was the defendant also asking

 5   the source to help him sell his car?

 6   A.  Yes.

 7   Q.  And this was a Cadillac, correct?

 8   A.  Correct.

 9   Q.  And this is they were trying to find out what the value of

10   this vehicle was, correct?

11   A.  There was discussions about the value of the vehicle.  Yes,

12   sir.

13   Q.  And can you explain to the Court what the defendant wanted

14   the source to do?

15            THE COURT:  If I could just clarify one thing.  Your

16   knowledge of the conversation, what was discussed, is derived

17   from the English translation; is that fair to say?

18            THE WITNESS:  That is correct, sir, yes.

19            THE COURT:  Okay.  Go ahead.

20   BY MR. WATERSTREET:

21   Q.  What was, what was the discussion between the defendant and

22   the source as to, as to what was supposed to happen with the

23   sale of the car and why the sale was going on, and things of

24   that nature?

25   A.  I don't know if it's in here, in this translation, but the

THOMAS HUSE - DIRECT

1  reporting we had received from the source, at least previously
2  stated that the sale of the vehicle would be used to help
3  finance his trip over to Lebanon.
4  Q.  Okay.  And --
5        THE COURT:  Excuse me, one second.  Your copy of that
6  is actually covering the microphone.  If you could --
7        THE WITNESS:  Okay, sir.
8        THE COURT:  Okay?  Okay?
9        THE WITNESS:  Yes, sir.
10  BY MR. WATERSTREET:
11  Q.  And so the sale of the car was to help finance the trip?
12  A.  Yes.
13  Q.  And what was -- was there some other request made as to
14  what was going to be done with any money that was going to be
15  left over, for the benefit of a family member?
16  A.  There was discussion at some point whether the money would
17  be given to the family.
18  Q.  Okay.  So after they start -- after they finish talking on
19  page 12 about the sale of the car, they then turn to going down
20  there?
21  A.  Yes, sir.
22  Q.  Okay.  And my question is, a few questions back, but it was
23  can you tell the Court a little bit about the nature of their
24  conversation concerning his travel to the Middle East?
25  A.  Yes.  In short, the source asked him if he still had plans

THOMAS HUSE - DIRECT

1  to go over to, to Lebanon for his intentions.  They discussed

2  whether he would be able to come back or not.  Mr. Hamdan

3  stated that he didn't care if he would be able to come back.

4      On page 13, they continue their discussion.  They

5  mention the party, which I know to be Hizballah.  Talks about

6  his specific plans for how he will make known once he gets

7  there that he wants to join in; that he will be using that,

8  that route in order to join in.  Talk about discussions about

9  the difficulty of doing it.  And that continues on into page 14

10 where they continuing that discussion about wanting to go over

11 there.

12 Q.  Was there a discussion on whether the defendant had been a

13 member of Hizballah in the past?

14 A.  Yes, sir, there was.  If I may?

15 Q.  And I, yeah, if I could direct you to page 20.

16 A.  Yes.  Beginning at the bottom of, of page 19 into 20, there

17 was discussion about some previous training that he received.

18 The source asked him if he was referring to training he

19 received from the Lebanese Army while he was in Lebanon.  And

20 he said that it was, no, it was with the party.

21 Q.  And the "party" being the Party of God, Hizballah?

22 A.  Correct.

23 Q.  And he said, it says, "with the party?"

24      And the defendant answered, "They would train you on

25 this at a young age."

THOMAS HUSE - DIRECT

1           And the source says, "Really?"

2           He says, "they would dismantle all the arms in front

3    of you."

4           Did he also indicate that in -- let me back up.  Are

5    you familiar that in 2006, there was a war between Hizballah

6    and Israel in southern Lebanon?

7    A.  Yes.

8    Q.  Okay.  And to your knowledge, the defendant came here to

9    the United States in 2007?

10   A.  That's correct.

11   Q.  So was there discussion between the source and the

12   defendant concerning whether the defendant was an active member

13   in Hizballah in 2006 during that, that war?

14   A.  Yes, there was.  Towards the end of the transcript,

15   beginning on page 35, there's discussion about when Mr. Hamdan

16   came over to the United States, there was a statement asking if

17   he was there during the war.

18           Mr. Hamdan said 2006, yes.  In 2000 -- the source

19   asked him, basically you were over there, what were you doing?

20           Mr. Hamdan states that he was in neighborhood

21   security, and that he was watching over people getting their

22   aid and stuff like that.

23   Q.  Was there also discussion on, a little bit more

24   particularly, about the defendant's intent to fight with

25   Hizballah?  And I'm going to refer you to page 23, about how he

THOMAS HUSE - DIRECT

1   would be able to financially support himself, things that --
2   A.  Yes.  There was discussion about how much someone would be
3   paid per month to go over there and fight.
4          Mr. Hamdan stated, "You will get paid about $500 to
5   $1,000 while you are fighting."  The source asked him, "From
6   the party?"  And Mr. Hamdan answered, "yes."
7   Q.  And then the question is, "what do you mean, what do you
8   mean by go there?"  And what was the defendant's response?
9   A.  Mr. Hamdan stated, "go there to fight."
10  Q.  Was there a discussion on page 15 about going over to
11  Lebanon, and then eventually going over to Syria and why he
12  thought things may work out with him getting to Syria?
13  A.  Yes.  Mr. Hamdan stated, page 15, "The Syrians over there
14  love you to death when they see that you, a Lebanese, trying to
15  get in, you are all set.  We have an authority over in Syria.
16  Lebanon and Syria will be ours when the crises ends."
17  Q.  Did he also explain some of the, some of the reasons why he
18  may want to leave the United States, why he's not happy here in
19  the United States, and may want to go fight for Hizballah?
20         And I'll refer you to page 12.  When he says, "I want
21  to leave, I want to leave from here.  That's it."  Starting
22  from that point down.
23  A.  Yes.  He discussed the reasons that he wanted to leave.
24  The source asked him, you know, what was, "what is bothering
25  you?"  Mr. Hamdan stated, "I am not comfortable here, man.  I

THOMAS HUSE - DIRECT

```
 1  don't have a degree.  I have nothing.  Work is not that good.
 2  There is nothing good.  Living is -- I am not comfortable, man.
 3  I have been able to help -- I haven't been able to help my
 4  parents as I should."
 5  Q.  And did he provide some more philosophical reasons later in
 6  the conversation about how people -- why he may want to leave
 7  the United States?
 8  A.  From referring to that same discussion --
 9  Q.  Yes.
10  A.  -- portion?
11  Q.  Actually, I believe he says it on page 16.
12  A.  Yes.  Mr. Hamdan is discussing, he states, "You have to
13  think about it.  You have to think about it.  Are you buying
14  your life or the afterlife?  Life is not eternal.  Whatever you
15  do in life, you will end up in the tomb eventually.  You will
16  choose wisely once you work toward your eternal life."
17        And then the source and Mr. Hamdan are discussing the
18  possibility of leaving behind -- the fact he's not leaving
19  behind any wife or children.
20        Mr. Hamdan goes on to state, "I am leaving behind a
21  family, I am leaving behind parents, I am leaving behind
22  people, but I just cannot leave this matter hanging.  No matter
23  how much you talk about it, you just simply cannot ditch this
24  matter.  My uncles tried to dissuade me and such, and I told
25  them yes.  I cannot tell them more than yes.  I appreciate what
```

```
 1   you said and I listened to you, but I cannot take your advice,
 2   because in the end, it is my decision and not anyone else's.  I
 3   will carry out this matter.  I will be the one to lose and no
 4   one else is going to lose."
 5   Q.  So he's basically saying --
 6            MR. WEISS:  Excuse me.  I'm going to object as to the
 7   characterization.  He's read the transcript.  He's indicated
 8   that's all he knows.
 9            I'm going to object as to Mr. Waterstreet leading him
10   through this mischaracterization that he has no basis or
11   foundation to opine upon.
12            THE COURT:  Can I hear the question?
13            MR. WATERSTREET:  I'll move on, Judge.
14            THE COURT:  Okay.
15            MR. WATERSTREET:  It's argument.  That's fine.
16   BY MR. WATERSTREET:
17   Q.  But this is the defendant talking when he says it's my
18   decision.  My uncles tried to dissuade me from going, but it's
19   my decision?
20   A.  That is correct.  That was Mr. Hamdan speaking.
21   Q.  Okay.  Now, there came a point in time that the FBI got
22   notice the defendant was going to be leaving the United States?
23   A.  That is correct.
24   Q.  And you were notified the defendant was flying out of
25   Detroit on what day?
```

1    A.  He was scheduled to fly out on March 16th.

2    Q.  Of this year?

3    A.  Correct.  2014.

4    Q.  And what was his ultimate destination, according to the

5    airline ticket?

6    A.  Beirut.

7    Q.  That was a return ticket though, correct?

8    A.  As far as we know, yes.

9    Q.  But in a conversation, the defendant meets with the source

10   just prior to leaving on his trip to Lebanon?

11   A.  Yes.

12   Q.  And were there comments made during that conversation that

13   indicates that he did not plan to come back to the United

14   States if he was successful in making it into Syria and

15   fighting along with Hizballah?

16   A.  That's correct.  Mr. Hamdan stated that if he makes it

17   there, he will not come back.

18   Q.  And again, these, this, this meeting was recorded?

19   A.  Yes, sir.

20   Q.  You provided copies to my office?

21   A.  Yes.

22   Q.  Those copies were provided to the defense counsel, as far

23   as you know?

24   A.  As far as I knew, yes.

25   Q.  As well as the transcripts were, were prepared from those?

THOMAS HUSE - DIRECT

1   A.  Correct.

2   Q.  And there was -- were there some indications that the

3   family was not too keen on the idea of him traveling to

4   Lebanon?

5   A.  Yes.

6   Q.  I want to talk particularly on page 6.  I mean, excuse me,

7   page 5 when he's starting with, "I mean, when I told my

8   sister."  It's on page 5, I believe.  I may have misspoke.

9   This is the --

10           MR. WATERSTREET:  May I approach, your Honor?

11           THE COURT:  You may.

12  BY MR. WATERSTREET:

13  Q.  Midway down in the transcript, "I mean, when I told my

14  sister."  Did you find that passage on page 5?

15  A.  Oh, yes.

16           Mr. Hamdan states, "Look how sad your parents become.

17  I mean, when I told my sister that I was just thinking about

18  going to Lebanon, she went hysterical.  I made my reservations

19  right away on the same day, you got me.  So she won't be able

20  to do anything, my brother."

21  Q.  So if his sister -- so he's -- these are his statements,

22  saying that he made his reservations right away, even though he

23  knew his sister would be hysterical about him going to Lebanon?

24  A.  Yes, sir.

25  Q.  Did later -- a few more.  As part of that continuing

THOMAS HUSE - DIRECT

1    conversation, did the source make mention, and particularly

2    tell the defendant that if he was going to be part of

3    Hizballah, he was going to be joining a terrorist organization

4    that was -- has been identified as a terrorist organization by

5    the United States?

6    A.  Yes, sir, he did.

7    Q.  And can you tell us, read what the source told the

8    defendant?  It's on that, I believe it's the bottom of that

9    same page.

10   A.  Yes.  The source states, "And be careful, you be careful

11   when you come back, because you know here, my brother, it is

12   regarded as terrorist in the U.S.  Do you know how?  I mean,

13   Hizballah are known to be terrorists.  Do you see how?  So one

14   must be careful and so forth, I mean."

15   Q.  So, so he particularly knows that if he goes to join there,

16   he will be joining a terrorist organization based upon that, at

17   least that comment?

18        MR. WEISS:  Well, your Honor, I'm going to object as

19   to what he believed that phrase --

20        THE COURT:  He said what he said.

21        MR. WEISS:  Thank you.

22   BY MR. WATERSTREET:

23   Q.  Then on page 6, do you have the discussion concerning what

24   the defendant intends to do, if he intends to come back or not

25   come back, depending upon how far he gets along?

1    A.  Well, right after that discussion I just read, the source

2    statement about Hizballah being terrorist, Mr. Hamdan states,

3    "I won't come back if I make it there.  If I make it there, I

4    won't."

5    Q.  Okay.  And then, then he clarifies by going there, midway

6    through the transcript, through that page?

7    A.  Yes.  The source asks him if he's going to Lebanon first.

8    Then he states yes.  And there's discussion about then going

9    back into Syria.  Or actually, before that, Mr. Hamdan state --

10   stated, "I will get a week at first.  I go to Lebanon and then

11   go back there."  The source asked him, "to Syria, right?"  Mr.

12   Hamdan stated yes.

13   Q.  Okay.  So, so according to what the defendant has stated up

14   to this point, that if he's successful making it into Syria,

15   he's not coming back to the United States?

16          MR. WEISS:  Object to, again, your Honor, he's --

17          THE COURT:  I think he's just characterizing what was

18   said.

19          MR. WEISS:  Well, if that's what it says.

20          THE COURT:  And you'll have the opportunity to

21   cross-examine.

22          MR. WEISS:  Thank you.

23   BY MR. WATERSTREET:

24   Q.  Was the defendant arrested before he was able to board that

25   plane?

1   A.  Yes, sir.

2   Q.  And did he have a valid Lebanese passport issued with his

3   photograph and his name, his valid passport, or did he have

4   some other travel document that he was able to obtain from the

5   Lebanese government?

6   A.  It is my understanding that he had a replacement passport

7   from the Lebanese government, good for approximately three

8   months.

9   Q.  To your knowledge, did the defendant claim that he lost his

10  Lebanese passport with the Dearborn Heights Police Department?

11  A.  That is correct.

12  Q.  And that he needed that report in order to be able to get

13  this travel document from the Lebanese government?

14  A.  Yes.  He stated to the Dearborn Heights Police Department,

15  based on, on their report, it said Mr. Hamdan stated he was

16  going to travel and needed a police report in order to get the

17  temporary passport.

18  Q.  After his arrest, or after around the time of the

19  defendant's arrest, did agents go to speak with the defendant's

20  mother at her home at 7017 Garling Drive in Dearborn Heights?

21  A.  Yes, sir.

22  Q.  And were the agents shown the room that she says that her

23  son was using?

24  A.  Yes.

25  Q.  And did it appear to the agents -- well, did you, did you

THOMAS HUSE - DIRECT

1  get a report about those events?

2  A.  I did.

3  Q.  And what were you told concerning that?

4  A.  I was given a description of the room, the items that were

5  in the room.  The report stated that the belongings appeared,

6  that were in the room, appeared to be -- they appeared to

7  belong to his mother, Ms. Hamdan.  And that the -- there was a

8  mattress, a smaller mattress that was leaning up against the

9  bed, that is where he slept on when he didn't sleep on the

10  couch.

11  Q.  Did the room appear to have been cleared out, except for --

12  A.  There were no items of Mr. Hamdan's in the room.

13  Q.  Did he also have a work van?

14  A.  To my knowledge, yes.

15  Q.  And did he also ask somebody to sell his work van for him

16  and give that money to his family?

17  A.  Yes.

18  Q.  As part of your follow-up investigation, did you find the

19  defendant had, through Open Source, a Facebook page?

20  A.  Yes.

21  Q.  Were you able to get a screen shot of that Facebook page?

22  A.  Yes.

23  Q.  I'm showing you what was marked Government's Exhibit 1.

24  Can you describe for the benefit of the record what that, that

25  shows?

1   A.   Yes.  There is a picture on this Facebook page, shows what

2   appears to be a female holding some type of a machine gun with

3   Arabic script written across the picture.

4   Q.   And did you present that, that document to your linguist to

5   see if they were able to translate the Arabic writing?

6   A.   Yes, sir, I did.

7   Q.   And was the translation words to the effect of Hizballah

8   girls make us proud?

9   A.   As best I can remember, yes.

10  Q.   Okay.  And this was on the defendant's Facebook page?

11  A.   That is correct.

12  Q.   After he was arrested, what explanation did the defendant

13  give you for the purpose of his travel to the Middle East?

14  A.   He stated he was traveling to have dental work conducted.

15           THE COURT:  To have what?

16           THE WITNESS:  Dental work.

17           THE COURT:  Okay.

18           MR. WATERSTREET:  May I have a moment, your Honor?

19           THE COURT:  Yes.

20           (Brief pause.)

21           MR. WATERSTREET:  I have no further questions at this

22  time.

23           THE COURT:  Mr. Weiss?

24           MR. WEISS:  Thank you, your Honor.

25                        CROSS-EXAMINATION

1   BY MR. WEISS:

2   Q.  Sir, you're the affiant for the criminal complaint in this

3   matter?

4   A.  Yes, sir.

5   Q.  Okay.  And at Paragraph 7, you list some events or

6   incidents that you claim Hizballah was involved in; is that

7   correct?

8   A.  That is correct.

9   Q.  Okay.  And the ones in '83, '84, '85, 1980's, Mr. Hamdan

10  wasn't even born yet, correct?

11  A.  Correct.

12  Q.  Okay.  The one in 1992, he was a year or less of age,

13  correct?

14  A.  Yes, sir.

15  Q.  Okay.  The one in '94, he was two or three at the time,

16  correct?

17  A.  I got to do the math, but that sounds about right.

18  Q.  And in 2000, he was 9, 8?

19  A.  Approximately eight or nine.

20  Q.  So you're not alleging that he was involved in any of

21  those, correct?

22  A.  That is correct.

23  Q.  Now, I recognize what you related to, or in response to Mr.

24  Waterstreet's questions about what is on the transcript, and

25  what Mr. Hamdan said he did in Beirut before he came to the

THOMAS HUSE - CROSS

1  United States.  Do you recall that passage?

2  A.  Yes, sir.

3  Q.  Okay.  Talked about being in some type of police unit; do

4  you recall that?  If you don't recall it, I'll move on and

5  we'll come back to it.

6  A.  I believe it was street security or security forces.

7  Q.  That wasn't the exact phrase, but in any event, that's what

8  we're talking about.

9  A.  Yes, sir.

10  Q.  Have you, or to your knowledge, has anyone on behalf of the

11  FBI done any investigation to either verify or refute the

12  accuracy of that assertion?

13  A.  No, sir.  I --

14  Q.  Okay.  So you don't know whether it's true or not; fair

15  statement?

16  A.  That is a fair statement.

17  Q.  Okay.  And we have, according to you, Mr. Hamdan and the

18  source having a series of conversations starting in the fall of

19  2013, and culminating on or about March 16th of 2014, correct?

20  A.  Yes, sir.

21  Q.  Okay.  And you indicated that the source had come to the

22  FBI indicating that he or she had this information, correct?

23  A.  Yes.

24  Q.  Okay.  And had this source provided any information to the

25  FBI prior to September of 2013?

```
 1             MR. WATERSTREET:  Your Honor, concerning what's the
 2   relevancy of the question?
 3             MR. WEISS:  Well, because with all due respect, Judge
 4   --
 5             THE COURT:  Overruled.
 6             MR. WEISS:  Thank you.
 7             THE COURT:  Go ahead.
 8   BY MR. WEISS:
 9   Q.  Did he -- is it okay if I refer to him as a "he"?  I did
10   hear the tape.  And even though I couldn't understand what it
11   was, I'm going to assume it's a male.  So if I --
12             THE COURT:  For purposes of this hearing, you can use
13   the masculine pronoun.
14             MR. WEISS:  Thank you.
15   BY MR. WEISS:
16   Q.  Did he provide any information to the FBI prior to this 20,
17   excuse me, September 13th -- September 2013 statements?
18   A.  Yes.
19   Q.  Okay.  Was he being paid?  Was he a paid informant?
20             MR. WATERSTREET:  Your Honor, I, I fail to find the
21   relevancy of this.
22             THE COURT:  You proffered information or elicited
23   information from a confidential informant whose reliability is
24   relevant to.
25             MR. WATERSTREET:  Right.  If the witness becomes -- if
```

1    the source becomes a witness, that's, that's when whether being

2    paid becomes relevant.  It's their --

3              THE COURT:  Their information is relevant.  The

4    reliability of the information is relevant.  Overruled.

5              MR. WEISS:  Thank you.

6              THE COURT:  Go ahead.

7    BY MR. WEISS:

8    Q.  Was he a paid informant?

9    A.  It is my understanding that he had received payments in the

10   past.

11   Q.  Monetary payments?

12   A.  Yes, sir.

13   Q.  Was he also trying to work off anything, any difficulty

14   that he may have with the United States Government?

15   A.  Yes, sir.

16   Q.  All right.  He had some immigration problems, correct?

17   A.  That is the way I understand it, yes, sir.

18   Q.  So he was doing this in return to get out of his problems,

19   correct?

20   A.  He was receiving an immigration benefit by working with the

21   Government.

22   Q.  So he would be able to, himself, remain in this country?

23   A.  That is correct.

24   Q.  Okay.  And it was explained to him, was it not, that that

25   benefit of being able to stay in this country was contingent

1   about what he was able to provide to the FBI, correct?

2   A.  I was not privy to those discussions with the source.

3   Q.  Okay.  Mr. Hamdan was born in 1991, I believe you

4   indicated?

5   A.  Yes, sir.

6   Q.  All right.  I don't want to know anything more about the

7   informant, but do you know what his age is?

8           MR. WATERSTREET:  Objection, your Honor.  He's --

9           MR. WEISS:  Well --

10          MR. WATERSTREET:  This is exactly what I was --

11          THE COURT:  Sustained.

12          MR. WATERSTREET:  Thank you.

13          THE COURT:  Go ahead.

14  BY MR. WEISS:

15  Q.  Is he substantially older than Mr. Hamdan?

16          MR. WATERSTREET:  Your Honor, objection.

17          THE COURT:  Sustained.

18          MR. WEISS:  All right.

19  BY MR. WATERSTREET:

20  Q.  Your information on or about September 12th, 2013 is, is

21  that he was going to leave by Christmas of 2013, correct?

22  A.  Yes, sir.

23  Q.  All right.  And we know that not to be true, correct?

24  A.  I know he did not leave in December 2013, yes, sir.

25  Q.  Okay.  So he did not leave by Christmas 2013?

1    A.   Correct.

2    Q.   He also indicated that his sister had his passport and was

3    preventing him from leaving, correct?

4    A.   Yes, sir.

5    Q.   All right.  Now, you indicated in response to Mr.

6    Waterstreet's questions about him applying for citizenship in

7    11 -- in November of 2013, correct?

8    A.   Yes, sir.

9    Q.   Okay.  And are you aware of the fact that he went to

10   Immigration in January of 2014 to fill out some paperwork

11   regarding his application for citizenship in this country?

12   A.   I don't have the information on that.

13   Q.   Okay.  If I told you that in January of 2014, he went to an

14   immigration office and made application for citizenship, and as

15   part of that application, he had to provide his passport --

16         MR. WATERSTREET:  Objection.

17   BY MR. WEISS:

18   Q.   Would you have any information on that?  Would you be --

19         THE COURT:  Objection?

20   BY MR. WEISS:

21   Q.   -- able to confirm or refute?

22         THE COURT:  Hold on.  What's your objection?

23         MR. WATERSTREET:  Objection.  He just said he has no

24   information on that.  And then counsel is suggesting what took

25   place.  If he said he has no information, he has no

1    information.

2          THE COURT:  You can ask the question.

3          MR. WEISS:  Thank you.

4          THE COURT:  If he has no information, he has no

5    information.

6    BY MR. WEISS:

7    Q.  All right.  Are you aware that in January of this year, Mr.

8    Hamdan went to an office of Immigration, made application or

9    filled out some additional paperwork to obtain his citizenship,

10   and that part of that application process was presentation of

11   his passport?

12   A.  No, sir.  I'm not aware of that.

13   Q.  If in fact, he had his passport, then it wasn't being held

14   or secreted from him; fair statement?

15          MR. WATERSTREET:  Objection, your Honor.  Speculation.

16   BY MR. WEISS:

17   Q.  Are you able to --

18          THE COURT:  Overruled.

19          MR. WEISS:  Thank you.

20   BY MR. WEISS:

21   Q.  If he had his passport, it wasn't being secreted from him,

22   correct?

23   A.  If he had a passport on the day he went to the immigration

24   office, that's correct, sir, he would have had it.

25   Q.  Thank you.  Okay.  Now, there was a passage that Mr.

THOMAS HUSE - CROSS

1    Waterstreet asked you about regarding the January 28th

2    transcript, pages 12, 13 and 14.  And there was some talk about

3    navigation and the number of miles and what have you.  And

4    that's being said by whom?

5    A.  There was a discussion as far as the vehicle, both Mr.

6    Hamdan, as well as the source are both discussing that vehicle.

7    Q.  All right.

8    A.  With regards to milage.

9    Q.  And in the paragraph where there's talking about 99,000

10   miles and navigation, who is the speaker?

11   A.  The source mentions 99 --

12   Q.  Okay.

13   A.  -- thousand miles.

14   Q.  And at the end of that paragraph, the source says something

15   to the effect, are you going down there, correct?

16   A.  Yes.

17   Q.  So in the same sentence, it's your source that is going

18   from talking about a motor vehicle here in the United States,

19   to Mr. Hamdan going down there, correct?

20   A.  Yes, sir.

21   Q.  So the source is the one that is changing the conversation

22   from the discussion regarding a motor vehicle, to going to the

23   Middle East, correct?

24   A.  That is correct.

25   Q.  Thank you.  All right.  Now, your source also indicates

```
1    from time to time about a brother named "Shady," his brother,
2    the source's brother, correct?
3    A.  Yes.
4    Q.  And he relates to the -- to Mr. Hamdan that his brother,
5    "Shady" is a member of Hizballah, correct?
6    A.  I believe that's what it says.  Yes.
7    Q.  And he relates to Mr. Hamdan that his brother goes into
8    Syria and fights on behalf of Hizballah in Syria, correct?
9    A.  I have to find the package (sic).  He does discuss going
10   into Syria.  I don't know how much details it gives.
11   Q.  And he talks about, well, he's there for two weeks and then
12   he comes back for a week.  Do you recall that passage?
13   A.  Yes.
14   Q.  And he's talking about his brother, Shady, correct?
15   A.  I believe so, yes.
16   Q.  Okay.  Do you know whether or not the source, in fact, has
17   a brother named Shady?
18   A.  I don't have any specific information that states.
19   Q.  All right.  Do you know whether or not if he has a brother
20   named Shady, that that brother actually goes to Syria and
21   fights on behalf of Hizballah for two weeks, and then comes
22   back for a week?
23   A.  I don't know.
24   Q.  To Lebanon?
25   A.  No, sir.  I don't have any information.
```

1    Q.  So whether or not he is telling him the truth, "him"

2    meaning the source, we don't know?

3    A.  That is --

4    Q.  Fair statement?

5    A.  -- correct.  Yes.

6    Q.  And were you present at the airport on March 16th when Mr.

7    Hamdan was arrested?

8    A.  Yes, sir.

9    Q.  Okay.  And you spoke to him?

10   A.  Yes, sir.

11   Q.  Okay.  Was that the first time that you had a conversation

12   with Mr. Hamdan?

13   A.  Yes.

14   Q.  Okay.  So you did not speak or were present during, whether

15   it was the September 2013, whether it was the January 28th, or

16   the March 16th meeting earlier in the day that was recorded,

17   you weren't present on any of those, correct?

18   A.  That is correct, sir.

19   Q.  Okay.  So whether Mr. Hamdan was conveying accurate

20   information to the source, you are uncertain, correct?

21   A.  That is correct.

22   Q.  Just like you don't know whether the source was giving

23   accurate information to Mr. Hamdan, correct?

24   A.  That is correct.

25   Q.  Okay.  Now, on page 14, on the January 28th transcript, Mr.

1    Waterstreet asked you a number of questions about what was

2    discussed.  Do you recall that?

3    A.  Yes.

4    Q.  Okay.  And there was some discussion about getting a

5    thousand, or excuse me, 500 or a thousand dollars, correct?

6    A.  Yes.

7    Q.  Okay.

8    A.  There was a discussion.

9    Q.  And he was saying that's what the party pays, correct?

10   A.  Yes, sir.

11   Q.  He doesn't say that's what I am going to get, does he?

12   A.  That is correct.  It says you will get paid $500 to a

13   thousand dollars.

14   Q.  So if you do this, this is what you get?

15   A.  Yes, sir.

16   Q.  But he doesn't tell the source, I am going to do this, and

17   I am going to get this money, correct?

18   A.  That is correct, sir.

19   Q.  Thank you.  Now, there's some discussion about religion and

20   the conflict in Syria, correct?

21   A.  I believe, I believe there was, yes.

22   Q.  Okay.  And at times, they talk about the conflict between

23   the Sunnis and the Shiites, correct?

24   A.  I believe so, yes.

25   Q.  Okay.  And there's discussion about the slaughter of Shiah

1   men, women and children, correct?

2   A.  I believe so, but I can't --

3   Q.  Okay.

4   A.  I don't know exactly where.

5   Q.  Okay.  And is it a fair statement that the fighting that

6   Hizballah is doing in Syria is being viewed by the Shiah

7   community as protecting Shiah men, women and children, correct?

8   A.  Are you asking me from the transcript?

9   Q.  That's correct.

10  A.  Or from --

11  Q.  Yes.

12  A.  I have to look back and see.  I'm not sure, sir.

13  Q.  Okay.  All right.

14          Now, you indicated that Mr. Hamdan went to the

15  Dearborn Heights Police Department and filled -- made a report

16  that he had lost his passport, correct?

17  A.  Yes, sir.

18  Q.  And that was in -- that was on or about March 4th of this

19  year, correct?

20  A.  That is correct.

21  Q.  Okay.  So if we assume what I told you before, that in

22  January he had his passport and he was able to present it to

23  the satisfaction of Immigration authorities when he made

24  application for citizenship, and yet, on by March 4th, he

25  didn't have it, that it was lost some time in that interim,

 1    correct?

 2    A.   Yes.

 3    Q.   Okay.

 4    A.   Based on those two facts, that would be a logical

 5    conclusion.

 6    Q.   He doesn't say to Dearborn Heights my sister is the hiding

 7    it from me, correct?

 8    A.   Correct.  As far as I remember, the police report mentioned

 9    nothing about --

10    Q.   He lost it?

11    A.   Correct.

12    Q.   And he gets a replacement Lebanese passport that is good

13    for three months, correct?

14    A.   That is my understanding, yes, sir.

15    Q.   Okay.  And work with me with the math and the calendar.

16          If you're leaving on or about March 16th, 2014 to go

17    to Lebanon, with a return flight on or about, is it May 3rd or

18    May 4th of 2014; do you recall?

19    A.   I believe the first itinerary I received was the 3rd.

20    Q.   May 3rd?

21    A.   Yes, sir, I believe so.

22    Q.   So the passport would still be good for that three-month

23    period, correct?

24    A.   Sir, the way I understand is that, that is the Lebanese

25    passport is good to get back into Lebanon.  While there, Mr.

THOMAS HUSE - CROSS

1   Hamdan would be required to get a permanent passport in which

2   he could return to the U.S. with.

3   Q.  Okay.  All right.  Now, you talk about that there was this

4   van that he wanted sold and that the proceeds go to the family,

5   correct?

6   A.  Yes, sir.

7   Q.  Okay.  And then there was also a Cadillac that was being

8   discussed as well, correct?

9   A.  Yes, sir.

10  Q.  All right.  Now, the source talks to Mr. Hamdan about the

11  source being in the business of buying and selling motor

12  vehicles, correct?

13  A.  They had discussed that --

14  Q.  Okay.

15  A.  -- previously.  Yes, sir.

16  Q.  And whether it's true or not, we don't know, and I'm not

17  going to ask you.  But the source advises Mr. Hamdan that he is

18  in the business of buying and selling cars?

19  A.  Yes.

20  Q.  Right?

21  A.  Mr. Hamdan was aware --

22  Q.  Okay.

23  A.  -- stated.

24  Q.  And Mr. Hamdan is indicating that he's got this Cadillac

25  that needs some work to it, correct?

1   A.   I'm sorry.  What do you mean by "work to it," sir?

2   Q.   I'm sorry.  That's a poorly worded question.  I apologize.

3        The Cadillac needed some work done on it, correct?

4   A.   I don't have the information at this time.

5   Q.   Do you recall the passage about there are scratches that

6   need to be repaired?

7   A.   Yes.  Yes.

8   Q.   Okay.  And he tells him that he's going to let his sister

9   utilize that vehicle while he's gone, correct?

10  A.   Yes.

11  Q.   Okay.  And he indicates that he also has a van, correct?

12  A.   I can't remember off the top of my head if it's in the

13  transcripts about the van or not.

14  Q.   Okay.  But he didn't need the van because he had the

15  Cadillac, correct?

16  A.   It's my understanding the van was used for work.

17  Q.   Okay.  And at the time, because of his health, he wasn't

18  working, correct?

19  A.   I don't know exactly the reason he wasn't working.  He said

20  he wasn't working.

21  Q.   Do you know anything about Hizballah beside what you've put

22  in your complaint?  I don't mean that in a negative way.  I'm

23  just curious, because I'd like to ask you a couple of

24  questions.

25  A.   I would not consider myself an expert, but I do have

1    familiarization with Hizballah.

2    Q.   Okay.  Hizballah, do they have a physical requirement to

3    take in individuals?

4    A.   I don't know, sir.

5    Q.   So if an individual, say, had only one lung, a dislocated

6    shoulder, asthma, allergies, bad knees, bad hands, would they

7    take him?

8    A.   I'm not sure, sir.  I don't know.

9    Q.   Okay.  All right.  And are you aware of the fact that Mr.

10   Hamdan is the only son, the only male, a child in the family?

11   A.   That is what I've been told.  Yes, sir.

12   Q.   And are you aware of the fact that unless your father was

13   martyred in battle, that they don't take the sole son of a

14   family?

15   A.   I don't have specifics on that, sir.

16   Q.   Okay.  But you agree with me that Mr. Hamdan's father is

17   alive and lives in this area, correct?

18   A.   From what I've been told, yes.

19   Q.   Okay.  All right.  And the fact that he was applying for

20   citizenship in the United States, how would Hizballah look upon

21   that, sir?

22   A.   I do not know, sir.

23   Q.   Okay.  Now, let's go back to the January 28th, 19, or

24   excuse me, 2014 transcript.  Your source is talking about the

25   party.  And as you've indicated in questioning from Mr.

1    Waterstreet, the "party" refers to Hizballah?

2    A.  Yes.

3    Q.  Correct?  Okay.

4         And the source is talking about Hizballah, and Mr.

5    Hamdan says they won't take me.  Do you recall that passage,

6    sir?

7    A.  That is correct, yes.

8    Q.  Okay.  So the party, Hizballah, is not going to take him,

9    correct?

10   A.  He did make that statement, yes.

11   Q.  Okay.  And the source, the source says, well, you know, you

12   can get in with connections.  And what does Mr. Hamdan says?

13   He doesn't want to use connections, correct?

14   A.  That's correct, sir.

15   Q.  Okay.  And he talks about when he gets to Lebanon, he's

16   going to stay there for two weeks, correct?

17   A.  There was a couple different places where timing was

18   discussed, but that was one of the places.

19   Q.  Approximately two weeks.  And then he talks about going to

20   Syria to see a shrine, correct?  Do you recall that?

21   A.  Yes, sir.

22   Q.  Okay.  Now, I don't know what expertise you may or may not

23   have in the Shiah Muslim faith, but are you aware of a shrine

24   in Syria that is extremely important to Shiah Muslims?

25   A.  Yes, sir.

1    Q.   It has nothing to do with Hizballah, correct?

2    A.   The connection with Hizballah, as I understand it, is that

3    Hizballah, from Open Source reporting, is currently guarding

4    that shrine.

5    Q.   But they allow any Shiah Muslim to come and visit the

6    shrine, correct?

7    A.   I don't have any information on who they allow.

8    Q.   Are you going to dispute that any Shiah Muslim could come

9    and visit the shrine, even if they are not affiliated or a

10   member of Hizballah?

11   A.   No, sir.  I have no reason to believe that.

12   Q.   Okay.  And earlier in, in the January 28th transcript,

13   there's a reference to getting a car for his sister, correct?

14   A.   Yes, I believe --

15   Q.   She would like a sporty car, perhaps?

16   A.   Yes, sir.

17   Q.   Okay.  Now, this is the sister who, just a couple of weeks

18   earlier he's complaining about hiding my passport and not

19   wanting me to go; do you recall that?

20   A.   As far as I understand that, yes, sir.

21   Q.   Okay.  And he's concerned about what kind of vehicle she

22   might like until he gets back, correct?

23   A.   There's discussion about what kind of vehicle he would like

24   to get her.

25   Q.   Okay.  All right.  There was a discussion that you had with

1   Mr. Waterstreet, still on the January 28th transcript, about

2   when he was a teenager, being involved in some neighborhood

3   security detail.  Do you recall that?

4   A.  Yes, sir.

5   Q.  First of all, you don't have any information as to be able

6   to either confirm or refute what he did in 2006 when he was

7   about 15 years old, correct?

8   A.  That is correct, sir.

9   Q.  And whether or not if there was some type of neighborhood

10  watch or a traffic security police detail, whether it had any

11  affiliation with Hizballah, correct?

12  A.  That is correct.

13  Q.  Okay.  I mean, there is a Lebanese government, correct?

14  A.  Yes, sir.

15  Q.  It is separate and distinct from Hizballah, correct?

16  A.  That is correct.

17  Q.  Okay.  So not everything that transpires in Lebanon,

18  particularly when he was there as a child, could be attributed

19  to Hizballah related or Hizballah supported, correct?

20  A.  That's how I understand it, yes, sir.

21  Q.  Okay.  And Mr. Waterstreet asked you about a passage where

22  he supposedly says something about weapons.  Do you recall

23  that?

24  A.  As far as previously receiving training --

25  Q.  Yeah.

1    A.  -- on weapons?  Yes, sir.

2    Q.  Okay.  But then he indicates when he's being -- when he's

3    talking about some traffic security that --

4            MR. WATERSTREET:  Can you refer to the page?

5            MR. WEISS:  Yeah, 35, 56.

6    BY MR. WEISS:

7    Q.  He goes, there's no weapons.  There were no weapons; do you

8    recall that?

9    A.  Yes.  I believe his statement was there were no weapons in

10   Beirut at that time.

11   Q.  All right.  So did he have the training on Mattel?

12   A.  I'm sorry, sir?

13   Q.  I withdraw that.  I apologize.  It was facetious.  I

14   apologize for it, sir.

15           Okay.  Let's go to the March 16th meeting that the

16   source has with Mr. Hamdan, correct?

17   A.  Yes, sir, March 16th.

18   Q.  He talks about, does he not, when he comes back, he wants

19   to start a new life?

20           MR. WATERSTREET:  What page are you on?

21           MR. WEISS:  Seven.

22           THE WITNESS:  I believe there was discussion about

23   that.  Yes, sir.

24   BY MR. WEISS:

25   Q.  Okay.  And when the source talks about do you have enough

THOMAS HUSE - REDIRECT

```
 1  money to travel, he says he's got $1,500, and if he needs more,
 2  he will ask his sister for more, correct?
 3  A.  I believe that's correct.  Yes, sir.
 4  Q.  So this is the sister that is hiding the passport, that is
 5  hysterical over him leaving, but that will give him more money
 6  to travel if he needs it, correct?
 7  A.  I don't know if she's listed by name in here, sir, but he
 8  talks about his sister giving money for him.
 9          MR. WEISS:  Okay.  If I could have a moment, Judge?
10          THE COURT:  Sure.
11          (Brief pause.)
12          MR. WEISS:  I don't have anything further.  Thank you,
13  your Honor.
14          THE COURT:  Mr. Waterstreet, any redirect?
15          MR. WATERSTREET:  Just one point of clarification.
16                        REDIRECT EXAMINATION
17  BY MR. WATERSTREET:
18  Q.  I think Mr. Weiss asked you a question suggesting that the
19  defendant realized that he couldn't get into Hizballah, so they
20  wouldn't take him.  But he said he knew how to get in, correct?
21  A.  Yes.
22  Q.  On page 13?
23  A.  Yes.  He went on to --
24  Q.  Go ahead.
25  A.  -- to explain how he would accomplish that.
```

THOMAS HUSE - REDIRECT

1  Q.  Okay.  So he didn't take no for an answer?

2  A.  If you read the whole context of those, those comments.

3  Q.  Go ahead.  You read the whole context?

4  A.  You will see that he later on describes, you know, making

5  it known of his intentions in going into Syria.

6  Q.  Then the very day he's about to leave on March 16th, his

7  source turns to him and he says I'm trying to convince you,

8  don't go.  Do not go.  And what was his response on page 7?

9  A.  Are you speaking about where he talked to him about being a

10 terrorist organization?

11 Q.  No.  Page 7.  He says, "I want to convince you don't go.

12 Don't."  And then he says, the defendant responds, "look, it's

13 like you're talking to a dead person.  That's it.  You see how?

14 I've made up my mind."  And the source says, "you've made up

15 your mind?"

16 A.  Yes.

17 Q.  "I don't want to change.  Because I want to start my life

18 after it."

19        He's starting his life as a member of Hizballah?

20 A.  That's the way I read it, yes, sir.

21        MR. WATERSTREET:  Thank you.

22                         RECROSS-EXAMINATION

23 BY MR. WEISS:

24 Q.  Because he goes onto say, "I'm going to come back here one

25 day," correct?

1   A.   Yes.  He have says, "if I find out that I cannot go over

2   there after staying one week in Lebanon, I will then come back

3   here and start a new life."

4   Q.   That's what he wants to do, because he wants a new, see the

5   new atmosphere, he wants to see what's going on abroad and

6   understand what's happening.  "I will be comfortable and

7   capable of coming back"; correct?

8   A.   Correct.  That's what he says, sir.

9           MR. WEISS:  Thank you.

10          THE COURT:  You can step down, sir.

11          (Witness excused, 1:26 p.m.)

12          THE COURT:  Mr. Waterstreet, do you have any other

13   witnesses?

14          MR. WATERSTREET:  No other witnesses, your Honor.

15          THE COURT:  Do you have anything else of a factual

16   nature you wish to proffer at this time?

17          MR. WATERSTREET:  Yes.  If I may, your Honor.

18          Your Honor, one of the factors the Court has to take

19   into consideration, so I'll make it -- ask the Court take

20   judicial notice of the defendant is facing a 15-year statute

21   under by attempting to provide material support to a foreign

22   designated -- designated foreign terrorist organization.

23          And I did a quick guideline calculation.  And based

24   upon providing material support to a foreign terrorist

25   organization and the terrorism factors that are taken into

 1    account, the defendant is looking at 292 to 365 months.  So

 2    he's looking at, if the Court is to follow the guidelines, he's

 3    looking at a sentence above the statutory maximum.  So he's

 4    looking at a 15-year sentence.

 5            The rest, factually, I also wish to point out to the

 6    Court that the United States and Lebanon have no extradition

 7    treaties.  That if he is able to successfully make his way to

 8    Lebanon, there's no way the United States would be able to

 9    extradite him to face these charges.

10            Throughout the transcript, he also made mention of

11    other family members that he has in Lebanon.  And if the Court

12    wishes, I can, I can point the Court directly to that section.

13    But in essence, he says that he has, he has more family members

14    there than here.

15            There are other parts in the transcript, your Honor,

16    that if the Court wishes to take a look at.  For example, page

17    21, his, his explanation is in speaking about his family not

18    wanting to go, "they are trying to forget about the subject.

19    They want to make me forget.  They tell me to stay in the

20    house, do nothing, don't work.  Just stay here.  I know my

21    parents took the passport, but they will know I will get

22    another one."  And of course he did, in fact, go and get

23    another passport, a temporary passport from the Lebanese

24    government.

25            Then on page 16, how his uncles tried to convince him

```
 1  not to go, "I appreciate what they said and I listened, but I
 2  cannot take your advice, because in the end, it is my decision
 3  and not anyone else's.  I will be executing this matter.  I
 4  will be the one to lose, and no one else is going to lose."
 5          THE COURT:  Are you proffering the transcripts, both
 6  transcripts?
 7          MR. WATERSTREET:  Yes.
 8          THE COURT:  As well?
 9          MR. WATERSTREET:  Yes.  If I may, your Honor?
10          THE COURT:  Mr. Weiss, do you have any objection to
11  that?  There's been obviously extensive testimony.
12          MR. WEISS:  We've -- both sides have used it.  And the
13  only thing I would ask is, before I call my witnesses, if I'm
14  able, I will use the -- I'll be paraphrasing what Mr.
15  Waterstreet advised the Court when he initially tendered them
16  to your Honor yesterday, and that was that they were
17  preliminary and they haven't been finalized.  But I recognize
18  we've both been using them.  So, and I don't know how much they
19  will change.
20          The only thing I can represent to the Court is when I
21  had individuals listen to them over the weekend, there were
22  some significant problems with the accuracy of the transcripts.
23  But that's for another day.
24          I do have a couple of witnesses, as well as a document
25  I'd like to be able to proffer to the Court.
```

```
 1              THE COURT:  Okay.  First of all, I'll accept the
 2   transcripts with the understanding that they are preliminary
 3   transcripts and may be subject to some modification at a later
 4   time.
 5              Okay.  Anything else, factually, Mr. Waterstreet?  And
 6   I'll, I'll read the transcripts thoroughly before I make a
 7   decision.
 8              MR. WATERSTREET:  May I then just highlight one other
 9   thing about extended family in Lebanon, your Honor?
10              THE COURT:  Go ahead.
11              MR. WATERSTREET:  Just bring that to the Court's
12   attention.  On page 3, he says I have --
13              THE COURT:  Which transcript are we talking about?
14              MR. WATERSTREET:  We are talking about on the, the day
15   he was arrested, on March 16th.
16              THE COURT:  Okay.
17              MR. WATERSTREET:  It says, do you have brothers -- the
18   question is, do you have brothers down there who can meet with
19   you or uncles?  "I have my uncle's family.  I have the whole
20   world over there.  I have more people than here."
21              Your Honor, I, I apologize.  I meant to bring this out
22   through the, through the agent, that when he was arrested, he
23   had approximately $1,300 in cash on him when he was arrested.
24   And I did not bring out the defendant's drug, drug conviction
25   because that's part of the Pretrial Services report.
```

```
1              THE COURT:  Okay.

2              MR. WATERSTREET:  But those, I have argument.  I do

3   have argument, your Honor.  But let's --

4              THE COURT:  We'll reserve that until --

5              MR. WATERSTREET:  All right.

6              THE COURT:  Mr. Weiss, do you have witnesses?

7              MR. WEISS:  Yes, I do.  Your Honor, if I may, with the

8   Court's permission, just since Mr. Waterstreet mentioned the

9   conviction, he was represented by counsel.  It was in the 20th

10  District Court in Dearborn Heights.  It was a simple possession

11  of marijuana.

12             It's my understanding that he was adjudicated under

13  Section 7411 of the Michigan Health Code.  Technically, there

14  is no conviction.

15             What I am advised is, and I'm going to say this by way

16  of proffer is, is that the attorney that represented Mr. Hamdan

17  in the district court there was to be on the same flight that

18  Mr. Hamdan was.  And both Mr. Hamdan and his counsel were

19  astute enough to recognize that since he was charged with an

20  offense, even though it's a misdemeanor, he can't leave the

21  state without the permission of the court.  They obtained

22  permission of the court to allow him to travel.

23             Now, because the attorney is still overseas, and I was

24  not counsel of record, and it's a 7411 case, that case is

25  sealed and technically, I'm not supposed to get information.
```

```
 1    But my office, being as resilient as it is, did contact the
 2    20th District Court.  And Judge, District Judge Plawecki sent
 3    me a letter, or faxed me a letter yesterday afternoon.  I've
 4    given Mr. Waterstreet a copy.  If I may approach?
 5              THE COURT:  You may.
 6              MR. WEISS:  Verifies the information that I was given
 7    that Mr. Hamdan sought and secured approval of the district
 8    court to travel, and that he was going to return.
 9              I guess, and I suppose I should save it for argument,
10    but suffice it to say that if he was going to go there and
11    fight and had no intentions of coming back, why on Earth would
12    he ask the district court to allow him to travel?
13              And it was referenced regarding the, the health
14    concerns that he has.  And my witnesses will, will address that
15    in further detail.
16              THE COURT:  Okay.  How many witnesses do you have?
17              MR. WEISS:  I'm going to try to limit it to three or
18    four.  I guess it will just -- I have a potential of six, but
19    I'm going to try to cut it down.  I beg the Court's indulgence.
20              THE COURT:  Mr. Waterstreet, are you seeking
21    sequestration of the witnesses?
22              MR. WATERSTREET:  If I -- yes, your Honor.
23              THE COURT:  Then why don't you call your first
24    witnesses.  Have all other witnesses or potential witnesses
25    step out into the hallway.
```

```
 1          MR. WEISS:  Your Honor, while my first witness is
 2    coming to the stand, if I could by way of proffer, the family
 3    has advised me, along with their acquaintances, that they own
 4    or are in the process of purchasing six residences either in
 5    Dearborn or Dearborn Heights.  They are worth various values,
 6    and they have various incumbrances on them.
 7          It is their belief that the total of six has a value
 8    of approximately $600,000, and that the incumbrances are
 9    somewhere -- some are without incumbrance at all.  Others have
10    some mortgages.  That would probably be approximately 200,000.
11    So that would leave a net, if their estimates are accurate, of
12    about $400,000, not only in property, but where they reside.
13          And all of them are willing, if the Court allows, when
14    it gets to combination of conditions that would reasonably
15    assure that he would remain here, they are willing to all put
16    up each and every one of those six residences.  I can give you
17    the addresses.  I don't know if the Court wants it at this
18    juncture.
19          THE COURT:  No.  As a matter of fact, let me just
20    inform you that I can't issue a real estate bond by
21    Administrative Order of this Court.  That would have to be done
22    by an Article III judge.
23          MR. WEISS:  I understand.  But I just wanted to make
24    the record.  And I just wanted to, in some way, begin my
25    response to the report of Pretrial Services that his ties to
```

HIBA HAMDAN - DIRECT

1    this community are somewhat fleeting and nebulous.

2              THE COURT:  Okay.

3              MR. WEISS:  All right.  If I may.

4              THE COURT:  Raise your right hand, please.

5              (Witness is sworn.)

6              THE COURT:  Take a seat.  State and spell your name

7    for the record, please.

8              THE WITNESS:  My name is Hiba Hamdan, H-I-B-A,

9    H-A-M-D-E-N.

10                          HIBA HAMDAN

11      called as a witness at 1:38 p.m., testified as follows:

12                        DIRECT EXAMINATION

13   BY MR. WEISS:

14   Q.  All right.  You have to speak up so everyone can hear you.

15   A.  My name is Hiba Hamdan.  H-I-B-A, H-A-M-D-A-N.

16   Q.  And are you related to Mr. Hamdan?

17   A.  Yes.  He's my brother.

18   Q.  Okay.

19              THE COURT:  He's who?

20              THE WITNESS:  My brother.

21              THE COURT:  Okay.

22   BY MR. WEISS:

23   Q.  Are you a student?

24   A.  Yes.

25   Q.  Okay.  Do you own a cell phone?

HIBA HAMDAN - DIRECT

1   A.   Yes.

2   Q.   Did you have a problem with that cell phone?

3   A.   Yes.  I broke the screen and dropped it in the toilet.

4   Q.   And did you try to get it repaired here?

5   A.   Yes.

6   Q.   And what were you told when you went to get it repaired?

7   A.   It was, it was about $275 to get it fixed; that's just the

8   screen.  And I wasn't going to pay that much for just a cell

9   phone.

10  Q.   All right.  Are you familiar with what it costs to make

11  those type of repairs in Lebanon?

12  A.   About $25.

13  Q.   Pardon?

14  A.   About 25.

15  Q.   35?

16  A.   Yeah, something like that.

17  Q.   Okay.  And what did you do with the phone when you found

18  out what it would cost to have it repaired in Lebanon?

19  A.   I gave it to my brother.

20  Q.   Gave it to your brother for what purpose?

21  A.   So he can get it fixed for me.

22  Q.   Okay.  And was he taking it with him when he went to

23  Lebanon on the evening of March 16th?

24  A.   Yes.

25  Q.   And he had it in his possession?

1    A.   Yes.

2    Q.   Okay.   What is your brother's health like?

3    A.   He has one lung.   He has kidney failure and dislocated

4    shoulder and a broken knee.   He can't really use his hands

5    right.

6    Q.   And what?

7    A.   His hands, he can't use them right.

8    Q.   What about his teeth?

9    A.   I tried to make an appointment with him, for him.   And

10   this, a couple days before he was supposed to leave, because

11   two of his, like, teeth broke, and it was, he thought it was

12   stupid to get them fixed.   He tried to fix one of them and they

13   told him he needs surgery.   And he talked to someone and they

14   told him that he can just get them fixed in Lebanon while he's

15   there.

16   Q.   Okay.   Do you know what the difference is between what it

17   would cost to have that dental work and surgery done here in

18   the states, as opposed to what it would cost to get it done in

19   Lebanon?

20   A.   In Lebanon, it would be a lot cheaper.   His whole mouth he

21   can do with costing one, one tooth here.

22   Q.   Okay.   And you're aware of the fact that he was on

23   probation to the 20th District Court in Dearborn Heights?

24   A.   Yes.

25   Q.   And he was supposed to take some classes, correct?

HIBA HAMDAN - DIRECT

1   A.   Yeah.   I was supposed to schedule them.

2   Q.   Did he ask you to do something for him regarding those

3   classes?

4   A.   Yes.   I was supposed to contact his case coworker to make

5   an appointment for him, May 15th.

6   Q.   And what was the purpose of making an appointment with the

7   case worker at the -- was that at the Probation Department of

8   the district court?

9   A.   Yes.

10  Q.   Okay.   And why did he ask you to make that appointment for

11  him?

12  A.   Because he was supposed to be leaving, and but when he

13  comes back, he wants to attend it so he's good for probation.

14  Q.   Were you aware of the fact that he was leaving?

15  A.   Yeah.

16  Q.   Were you hysterical over the fact that he was leaving?

17  A.   I was upset.

18  Q.   Why were you upset?

19  A.   Because it's pretty dangerous to leave.

20  Q.   Why is it dangerous there?

21  A.   There's a lot of bombings.

22  Q.   Okay.   So even though you're not a member of an army?

23  A.   No.

24  Q.   Or a terrorist organization, it can still be dangerous?

25  A.   Yeah.

HIBA HAMDAN - DIRECT

1   Q.  Okay.  Did you hide anything from him?

2   A.  No.  My other sister, she's the one that's being accused of

3   that stuff.

4   Q.  She's being accused of it, correct?

5   A.  Yeah.

6   Q.  To your knowledge, is it true?

7   A.  I don't know.

8   Q.  Okay.

9   A.  Can't answer that.

10  Q.  We'll ask her?

11  A.  Yeah.

12  Q.  All right.  Is there any doubt in your mind that your

13  brother was coming back?

14  A.  He was coming back.  He was supposed to come back.

15  Q.  Are you familiar with Facebook?

16  A.  Yes.

17          MR. WEISS:  Your Honor, if I may retrieve that

18  photograph that the Government gave?  I've got it somewhere on

19  the papers, but if I could?  And if I could approach the

20  witness?

21          THE COURT:  You may.

22  BY MR. WEISS:

23  Q.  Ma'am, I'm going to hand you what the Government has

24  offered as an exhibit, and ask you if you can identify what

25  that is.

HIBA HAMDAN - DIRECT

1   A.   That's someone's Facebook page with a woman holding a gun

2   with Arabic writing across the picture.

3   Q.   All right.  Now, there's something there --

4            MR. WEISS:  If I may ask her a couple questions --

5            THE COURT:  You may.

6            MR. WEISS:  -- from there?

7            THE WITNESS:  Yeah.

8   BY MR. WEISS:

9   Q.   Towards the right hand, about not quite the middle of the

10  page, it says "add friend" in a box?

11  A.   Yeah.  That proves that that person does not have any, any

12  contact with this page.  It just shows that they've probably

13  looked at it or someone requested to look at it or something

14  like that.  But that, that just proves that there's -- they've

15  never even looked at the page.  That doesn't show anything at

16  all.

17  Q.   So it's not like the person adopted it?

18  A.   No.

19  Q.   Or made that person a friend?

20  A.   No.

21  Q.   And if I could direct your attention to, looks like a

22  silhouette on the left side of the page in a larger box, almost

23  like a snapshot, what is your understanding of Facebook, what

24  does that mean?

25  A.   That shows it's a female, not a male.

1  Q.  And the female, is that whose Facebook page those pictures

2  originated from?

3  A.  Yes.

4  Q.  Okay.  So that isn't -- that didn't originate with your

5  brother?

6  A.  No.

7  Q.  Okay.  And he didn't adopt that person as a friend?

8  A.  No.

9          MR. WEISS:  Shows you my lack of --

10          THE COURT:  It's all very educational to me also.

11          MR. WEISS:  Nothing further.  Thank you, your Honor.

12          THE COURT:  Mr. Waterstreet?

13                  CROSS-EXAMINATION

14  MR. WATERSTREET:

15  Q.  Your mother told the Probation Department that your brother

16  is unemployed; is that right?

17  A.  Yeah, currently.

18  Q.  What's that?

19  A.  Currently.

20  Q.  Currently.  How long has it been since he's had a job?

21  A.  He stopped working about a month ago.

22  Q.  Your mother says that he was unemployed for five years.

23  A.  No.  He was working.  It was just working, and nonstop,

24  working and nonstop.

25  Q.  So when your mother told the Probation Department he was

HIBA HAMDAN - CROSS

1  unemployed for five years, that was incorrect?

2  A.  Not correct.

3          MR. WEISS:  Your Honor, it's not -- excuse me.  It's

4  not appropriate to ask one witness the veracity of someone who

5  is not even testifying.

6          THE COURT:  You're correct.

7          MR. WEISS:  We don't know what she's said --

8          THE COURT:  Objection sustained.

9          MR. WEISS:  Thank you.

10  BY MR. WATERSTREET:

11  Q.  So why don't you tell us what you know about your brother's

12  employment then.

13  A.  He worked -- he stopped working about a month ago, because

14  he was working with construction.  And because he has one lung,

15  the other one was about to get messed up because of all the

16  dust, and he had to stop working.

17          Before that he worked, about three months before that,

18  he worked somewhere else with the electricity and with his,

19  with his father.  And he couldn't, because I mean, it was hard

20  work and he couldn't do it anymore.

21  Q.  Okay.  And who was his employer?

22  A.  It's Mahmoud (phonetic) or Nader (phonetic), one of the

23  two.

24  Q.  Do you know first names, last names?

25  A.  Yeah.  Mahmoud.

HIBA HAMDAN - CROSS                                    63

1    Q.  Is it Mahmoud Nader?

2    A.  His brother is Nader.

3    Q.  Do you know, is that a first name or last name?

4    A.  It's a first name.

5    Q.  Do you know his last name?

6    A.  Um-umm.  No.

7    Q.  So it's Mahmoud, Nader's brother?

8    A.  Yeah.

9    Q.  Can you be any more specific as to who he worked for?

10   A.  He, they had like their own little company.

11   Q.  What did they do?

12   A.  I mean, construction, electricity, stuff like that.

13   Q.  So your brother did construction?

14   A.  Yeah.  And he couldn't anymore.

15   Q.  All right.  When did he lose his lung?

16   A.  When he was a baby.

17   Q.  Okay.  When he submitted documents to come here to the

18   United States, he had x-rays taken.  And it said he had two

19   lungs.  Do you know how that could have possibly happened?

20   A.  It's there, it's just not functioning.

21   Q.  Oh.  And when the doctor said that his lungs are normal and

22   they work normally?

23           MR. WEISS:  Excuse me, your Honor.  This is assuming

24   facts not in evidence.  I'm not aware of any of this.  So I'm

25   going to take umbrage to it.  I object.

```
 1              THE COURT:  Better you should object than take
 2   umbrage.  Okay.  Sustained.
 3              MR. WEISS:  Thank you.
 4   BY MR. WATERSTREET:
 5   Q.  So it's your belief as a lay person that his lung doesn't
 6   work?
 7   A.  It doesn't work.
 8   Q.  Okay.  But if I had a report from a doctor that says it's
 9   fine, would you, would you object to that?
10              MR. WEISS:  Same objection, your Honor.  He's asking
11   her to, to --
12              THE COURT:  Sustained.
13              MR. WEISS:  Thank you.
14   BY MR. WATERSTREET:
15   Q.  Now, were you the sister that confirmed that he had no
16   significant work history when the Probation Department called?
17   A.  It was probably my other sister.
18   Q.  Well, where does your sister live?
19   A.  3964 Mayfair.
20   Q.  Excuse me?
21   A.  3964 Mayfair.
22   Q.  Okay.  So when the Probation Department -- let me see, do
23   you recognize this number, (313) 663-0661?
24   A.  That's my sister's cell phone number?
25   Q.  That's your sister's cell phone number.
```

1   A.   Yeah.

2   Q.   Okay.  So when your mother confirmed -- so was it you or

3   your mother that confirmed that phone number with Probation

4   Department being your home phone number at 7017 Garling?

5   A.   My mother doesn't speak English to confirm that.

6   Q.   Okay.  So when they called, did the Probation Department

7   talk to you then?

8   A.   They talked to my sister.

9   Q.   Okay.

10          MR. WEISS:  Your Honor, maybe we can cut through this.

11   The sister will be one of the witnesses.  So perhaps Mr.

12   Waterstreet can direct those questions to her.

13          THE COURT:  You never talked to anyone from our

14   Probation Department?

15          THE WITNESS:  No.

16          THE COURT:  Or Pretrial Services Department?

17          THE WITNESS:  No.  I was supposed to, though.

18          THE COURT:  Okay.  Go ahead.

19   BY MR. WATERSTREET:

20   Q.   When was the last time you had your teeth fixed in Lebanon?

21   A.   I didn't.  I got them fixed here.

22   Q.   Okay.  So how much does it cost to have a tooth extracted

23   from your own personal experience?

24   A.   I have -- I mean, I got my tooth fixed the other day.  It

25   was 200 and something just for a cavity.

HIBA HAMDAN - CROSS

1   Q.  My question to you is you, you gave us your opinion that

2   it's cheaper in Lebanon to have your teeth fixed.  When did you

3   have your teeth fixed in Lebanon?

4   A.  I didn't.  I just know people that have.

5   Q.  Okay.  So you've -- this is what you've heard from somebody

6   else?

7   A.  Yeah.

8   Q.  Okay.  But you don't have any personal information?

9   A.  No.

10  Q.  Okay.  Do you know from your own personal experience

11  whether there is mail service between Lebanon and the United

12  States?

13  A.  I don't understand the question.

14  Q.  Can people mail something from the United States to

15  Lebanon?

16  A.  I guess, yeah.

17  Q.  Have you, have you or any of your family members ever

18  mailed anything back to relatives back in Lebanon?

19  A.  If someone is transporting from here to there.

20  Q.  I notice you keep looking out into the --

21  A.  I'm looking right at you.

22  Q.  Okay.  Have you or any of your family members ever mailed

23  anything to Lebanon?

24  A.  If someone is transporting, yeah.

25  Q.  No.  Mail.  You know what --

```
 1   A.   Yeah.
 2   Q.   -- the U.S. mail is?
 3   A.   No.  We didn't use that before.
 4   Q.   Do you use -- so there is no mail service between the
 5   United States --
 6            MR. WEISS:  That's not what she said, your Honor.  She
 7   says she hasn't mailed anything.
 8            THE COURT:  Right.  Now the question is --
 9            MR. WEISS:  Transfer.
10            THE COURT:  -- do you know --
11            THE WITNESS:  No, I don't.
12            THE COURT:  -- whether there's mail service between
13   the United States and Lebanon.
14            THE WITNESS:  I don't know.  I don't have any
15   knowledge about that.
16            THE COURT:  Okay.  She doesn't know.
17   BY MR. WATERSTREET:
18   Q.   All right.  And when your brother is not working, what does
19   he do?
20   A.   He stays home or goes out with his friends.
21   Q.   Okay.  And what -- who are some of his friends?
22   A.   They'll be testifying right after me.
23   Q.   No.  I need their names.
24   A.   There's Hussein Awada.  There's Ali Khashab.  There's -- I
25   can't, I can't remember his name.  Mahmoud.  But I can't get
```

HIBA HAMDAN - CROSS

1   his last name.

2   Q.  Okay.

3   A.  His other friend that will be testifying, he can give you

4   all their names.

5   Q.  So you only can think of two names, and maybe a third?

6   A.  Yeah.  I, I don't know, I don't know their names, but I

7   know them.

8   Q.  Okay.  And when your brother has lived with you, where does

9   he stay?

10  A.  He stays in our home.

11  Q.  Where?

12  A.  There's an upstairs room right next to mine.

13  Q.  Okay.

14  A.  Sometimes he sleeps on the couch downstairs next to the TV.

15  Q.  Okay.

16          MR. WATERSTREET:  I have no further questions, your

17  Honor.

18          THE COURT:  Redirect?

19          MR. WEISS:  If I may get the other next witness?

20          THE COURT:  You may step down.

21          (Witness excused, 1:51 p.m.)

22          THE COURT:  Mr. Weiss, we're going to take a brief

23  break here while I call another case.  It will be very brief.

24          MR. WEISS:  Sure.  Can he sit over here, your Honor?

25          THE COURT:  Oh, sure.  Why don't you sit in the

1   witness stand there.  Sit in the witness stand.

2       (Recess taken, 1:52 p.m. - 1:56 p.m.)

3           THE CLERK:  The Court recalls case No. 14-30120.

4   United States of America vs. Mohammad Hamdan.

5           THE COURT:  We have no attorneys.

6           Where is Mr. Weiss?

7           (Brief pause.)

8           MR. WEISS:  Yes, your Honor.

9           THE COURT:  Are you ready to proceed, Mr. Weiss?

10          MR. WEISS:  Yes.  Thank you.

11          THE COURT:  Sir, would you stand please and raise your

12  right hand.

13          (Witness is sworn.)

14          THE COURT:  Please have a seat.  And state and spell

15  your name for the record.

16          THE WITNESS:  Hussein Awda.  A-W-D-A, first name,

17  H-U-S-S-E-I-N.

18          THE COURT:  Go ahead, Mr. Weiss.

19                          HUSSEIN AWDA

20     called as a witness at 1:57 p.m., testified as follows:

21                      DIRECT EXAMINATION

22  BY MR. WEISS:

23  Q.  Sir, how long have you been in the United States?

24  A.  In June, I'll be four years.  Five years.

25  Q.  Okay.  What is your status in this country?

HUSSEIN AWDA - DIRECT

1    A.   A green card holder.

2    Q.   Okay.  Are you employed?

3    A.   Yes, sir.

4    Q.   What do you do for a living?

5    A.   I'm a medical assistant.  I graduate one month ago, and I

6    work at Domino's now.

7    Q.   Domino's Pizza?

8    A.   Yes, sir.

9    Q.   Okay.  All right.  Do you know Mr. Hamdan?

10   A.   Yes, sir.

11   Q.   How long have you known him?

12   A.   2004.

13   Q.   All right.  That's when you were in Lebanon?

14   A.   Mh-hm.

15   Q.   Is that a yes?

16   A.   Yes, sir.

17   Q.   Okay.  And was Hamdan in Lebanon as well?

18   A.   Yes, sir.

19   Q.   Okay.  How often did you see him while you were in Lebanon?

20   A.   Every day.

21   Q.   When did you come to the, to the United States?

22   A.   2009.

23   Q.   Okay.  Did you see him in 2006?

24   A.   Yes, sir.

25   Q.   Okay.  Was he a member of Hizballah?

 1   A.   No, sir.

 2   Q.   Was he a member of any armed unit?

 3   A.   No, sir.

 4   Q.   Was he a member of any police force?

 5   A.   No.

 6   Q.   Did he ever have weapons in his possession?

 7   A.   No.

 8   Q.   Did he ever receive weapons training?

 9   A.   No.

10   Q.   Did he learn how to assemble and disassemble weapons?

11   A.   No.

12   Q.   Did he have anything to do with any military or

13   paramilitary organization?

14   A.   No.

15   Q.   Pardon?

16   A.   No.

17   Q.   Okay.  Do you know what his health is like?

18   A.   Yes, sir.

19   Q.   What is his health like?

20   A.   He got a bad shoulder, bad knee.  He got one, one lung.

21   And he, like five centimeters open on his left lungs, I think.

22   And he can't even -- when he run a little bit, he'll be like

23   tired, so tired.  Like, if I let him run from here to the door,

24   he'll fall on the floor.

25   Q.   Are you aware of the fact that he was planning a trip to

HUSSEIN AWDA - DIRECT

1   Lebanon?

2   A.  Yes, sir.

3   Q.  Okay.  And what was your understanding of what that trip

4   was about?

5   A.  To fix his teeth, see his friends.  He got a little

6   depressed because of his ex-fiancée.  So he just want to go

7   have fun a little bit and take care of his health problem and

8   come back.

9   Q.  All right.  Is that one of the reasons why he was looking

10  forward to a new beginning when he came back?

11  A.  Yes, sir.

12  Q.  Okay.  When you talk about getting his teeth done in

13  Lebanon, why couldn't he get his teeth done here?

14  A.  Because, I did the same thing, it's cheaper in Lebanon.

15  Because if you go here to fix your teeth, it will cost you so

16  much.  When you do it in Lebanon, like you can fix your whole

17  teeth for like 200, $300.  So why not go have fun, fix our

18  health and come back.

19  Q.  So the money that you save on your teeth, you can spend on

20  a trip?

21  A.  Yes, sir.

22  Q.  And you actually had dental work done?

23  A.  I did this.

24  Q.  And it was your understanding Mr. Hamdan was going to get

25  similar type of dental work?

HUSSEIN AWDA - DIRECT

1   A.  Yes.

2   Q.  To your knowledge -- strike that.

3           Once you came to the United States, how often did you

4   see Mr. Hamdan?

5   A.  Every day.

6   Q.  Did he ever express any desire to join Hizballah?

7   A.  No.

8   Q.  Did he ever express any desire to go fight in the Middle

9   East?

10  A.  No.

11  Q.  Did he ever express any radical ideas?

12  A.  No.

13  Q.  Is he a particularly religious individual?

14  A.  No.

15  Q.  To your knowledge, did he want to go through and become a

16  citizen of the United States?

17  A.  Yes.

18          MR. WEISS:  Just one moment, your Honor?

19          THE COURT:  Sure.

20          MR. WEISS:  Nothing further.  Thank you, Judge.

21          THE COURT:  Mr. Waterstreet?

22          MR. WATERSTREET:  Yes, your Honor.  If I may have one

23  moment?

24          THE COURT:  Sure.

25                      CROSS-EXAMINATION

HUSSEIN AWDA - CROSS

1  BY MR. WATERSTREET:

2  Q.  You said that the defendant would fall over if he ran from

3  where you're seated right now, to where I am here, correct?

4  A.  The door.

5  Q.  That's --

6  A.  Yeah.

7  Q.  -- what would you guess, 20 feet?

8  A.  Yeah.

9  Q.  Right?

10  A.  Mh-hm.

11  Q.  But you told the Detroit Free Press you play soccer with

12  him all the time.

13       With you playing soccer, do you run more than 20 feet

14  in soccer?

15  A.  Yeah.  We, we played soccer --

16  Q.  Do you run more than 20 --

17       MR. WEISS:  Your Honor, if he's going to -- excuse me.

18       THE WITNESS:  Oh, okay.  I'm sorry.

19       MR. WEISS:  He's going to ask him a question, he's got

20  to give him the courtesy to complete the answer.

21       THE COURT:  Complete the answer, please.

22       THE WITNESS:  Okay.  When, when we play soccer, you

23  know how you exchange players in soccer.  So we used to take

24  him just for having fun, so we don't leave him around, like you

25  stay home, you can't run.  You know, he's going to feel bad,

 1   you know what I'm saying?  Like he just join us, he go down,

 2   exchange with us, have fun, cheering, you know.

 3   BY MR. WATERSTREET:

 4   Q.  Okay.  When you say we play soccer, when you play soccer,

 5   do you run more than 20 feet?

 6   A.  Yeah.

 7   Q.  Okay.  Do you run more than 50 feet?

 8   A.  Yeah.

 9   Q.  Do you run more than 100 feet?

10   A.  Mh-hm.

11   Q.  Is that yes?

12          THE COURT:  You have to say yes or no.

13          THE WITNESS:  Yes, sir.

14   BY MR. WATERSTREET:

15   Q.  Okay.  You also said the defendant only has one lung.  But

16   you also admitted that he smokes the hookah with you, right?

17   A.  Right.

18   Q.  You have to take in smoke into your lung and breathe out

19   smoke?

20   A.  Mh-hm.

21   Q.  Is that right?

22   A.  Mh-hm.

23          THE COURT:  You have to say yes.

24          THE WITNESS:  Yes, sir.

25   BY MR. WATERSTREET:

HUSSEIN AWDA - CROSS

1    Q.   Okay.  Do you also smoke marijuana with him?

2    A.   No.

3    Q.   Okay.  But you say you sometimes play soccer with him.  And

4    your idea of him playing soccer is standing and cheering?

5    A.   Yeah.  He plays too, but not like --

6    Q.   Well, how does he play?

7    A.   Two minute, three minute.

8    Q.   Does he stand for two or three minutes, or does he actually

9    run?

10   A.   Two, two, three minute, like we put him on defense,

11   standing.

12   Q.   Does he run?

13   A.   A little bit.

14   Q.   Okay.  So does he run more than 20 feet?

15   A.   Kind of.

16   Q.   And after that 20 feet, does he just fall down?

17   A.   Yes.

18   Q.   He just, he runs 20 feet and just falls to the ground?

19   A.   Yes.  And we take him out.

20   Q.   And that's the soccer player you want on your team?

21   A.   Just having fun.  It's not like we're --

22            MR. WATERSTREET:  No further questions, your Honor.

23                        REDIRECT EXAMINATION

24   BY MR. WEISS:

25   Q.   Why don't you complete your answer, because Mr. Waterstreet

HUSSEIN AWDA - REDIRECT

```
 1  felt that he had to cut you off.

 2  A.   We're just having fun.

 3  Q.   So why don't you complete your answer.

 4  A.   Like friends between each other, we go play soccer for a

 5  little bit.  It's not like we're winning a champions league or

 6  something.  We don't care if we're losing or winning, you know.

 7  Something like similar, we do it every day, every week.  So

 8  it's not like we're going to kill each other because we're

 9  playing soccer.

10  Q.   All right.  And ever since he was a child, he's had a

11  difficulty with one lung that didn't work?

12  A.   Mh-hm.

13  Q.   Is that a yes?

14  A.   Yes, sir.

15          MR. WEISS:  Okay.  Thank you.  Nothing further.

16          THE COURT:  Step down.

17          THE WITNESS:  Thank you.

18          (Witness excused, 2:05 p.m.)

19          MR. WEISS:  If I may, your Honor?

20          THE COURT:  Yes.

21          Step up to the stand and raise your right hand,

22  please.

23          (Witness is sworn.)

24          THE COURT:  Take a seat.  Please state and spell your

25  name for the record.
```

ALI MOUNZER - DIRECT

| 1 | THE WITNESS:  First name is Ali.  Last name is |
|---|---|

1      THE WITNESS:  First name is Ali.  Last name is

2  Mounzer.

3      MR. WEISS:  Spell it, please.

4      THE WITNESS:  A-L-I, last name, M-O-U-N-Z-E-R.

5      MR. WEISS:  Thank you, your Honor.

6                    ALI MOUNZER

7   called as a witness at 2:05 p.m., testified as follows:

8                  DIRECT EXAMINATION

9  BY MR. WEISS:

10 Q.  Sir, do you know Mr. Hamdan?

11 A.  Yes, I do.

12 Q.  How long have you known him?

13 A.  A little bit over five years.

14 Q.  Where were you on March 16th, 2014?

15 A.  I spent most of my day with Mohammad Hamdan.

16 Q.  Mr. Hamdan here?

17 A.  The defendant.

18 Q.  Did you accompany him to a restaurant?

19 A.  Yes, I did.

20 Q.  Okay.  And before going to a restaurant, did Mr. Hamdan do

21 anything?

22 A.  We basically smoked and --

23 Q.  Smoked what?

24 A.  Marijuana.

25 Q.  Okay.  When he went to the restaurant, was he high?

ALI MOUNZER - DIRECT

1   A.  Yes, he was.

2   Q.  Okay.  And at the restaurant, did you meet an individual

3   who worked or owned the restaurant?

4   A.  Yeah.  We, we went, we met with the owner of the

5   restaurant.

6   Q.  Okay.  And did the owner ask Mr. Hamdan to go somewhere

7   with him?

8   A.  Yes, he did.

9   Q.  Okay.  And they left you behind?

10  A.  Yes.

11  Q.  And how long were they gone?

12  A.  I would say about 15, 16 minutes.  Maybe a little bit more.

13  Q.  Okay.  And did you discuss with Mr. Hamdan, either before

14  he left with the owner or after he came back, about why he was

15  going to Lebanon?

16  A.  Yes, I did.

17  Q.  And what was your understanding of why he was going to

18  Lebanon?

19  A.  Basically he was trying to get over his ex, you know, go

20  there for vacation.  He had some health issues, and it was

21  cheaper for him to get it done overseas.  So he figured he'll

22  get it done at the same time.

23  Q.  All right.  You're familiar with the fact that Mr. Hamdan

24  smokes marijuana?

25  A.  Yes.

ALI MOUNZER - DIRECT

1  Q.  Okay.  Are you familiar with the fact that he got caught

2  with marijuana in Dearborn Heights?

3  A.  Yes.

4  Q.  And he was dealing with it, correct?

5  A.  Yeah.

6  Q.  And what did Mr. Hamdan do so that he wouldn't get in

7  trouble anymore with marijuana?

8  A.  He went ahead and he tried to get his medical card.

9  Q.  Medical marijuana card?

10  A.  Yeah.

11  Q.  And did he pay the money?

12  A.  Yeah.  I know a fact --

13  Q.  He submitted it?

14  A.  Yeah.

15  Q.  Got the temporary card?

16  A.  Yes, he did.

17  Q.  When did this occur?

18  A.  Shortly after being caught with, you know, with the case.

19  Q.  Was this in March?

20  A.  Yeah.  Beginning, beginning of March, yeah.

21  Q.  Maybe three or four weeks ago?

22  A.  Yeah.

23  Q.  Now, let me ask you, is a Michigan medical marijuana card,

24  to your knowledge, valid in Lebanon?

25  A.  No, it's not.

ALI MOUNZER - CROSS

1    Q.  Is it valid in Syria?

2    A.  No.

3    Q.  So the only reason that in March of this month he would get

4    a medical marijuana card, was to utilize in the state of

5    Michigan?

6    A.  Yes.

7    Q.  Is there any doubt in your mind that after this trip to

8    Lebanon, he was coming back?

9    A.  No.  He was coming back for sure.

10   Q.  And has he ever expressed any desire to join Hizballah?

11   A.  Not at all.  Not at all.

12   Q.  Has he ever expressed any affinity or support for

13   Hizballah?

14   A.  No.  Never.

15   Q.  Does he support any type of terrorist activities?

16   A.  No.

17   Q.  He was coming back?

18   A.  Yeah, for sure.

19          MR. WEISS:  Thank you.  Nothing further.

20          THE COURT:  Cross-examine?

21          MR. WATERSTREET:  Yes.

22                        CROSS-EXAMINATION

23   BY MR. WATERSTREET:

24   Q.  How long has he been involved in continually smoking

25   marijuana?  The defendant.

1   A.  Obviously I'm not sure, you know.  I mean, since I've met

2   him I know he's been smoking, I know, off and on.

3   Q.  And you met him back in when?

4   A.  I would say late '06 maybe.

5   Q.  Okay.  So what is that, eight years?

6   A.  I would say, yeah.  I don't know the math.

7   Q.  And it's --

8   A.  About a little less than, less than that.

9   Q.  It's after he got caught that he then got the medical

10  marijuana license?

11  A.  Well, actually, not till this past year, it was, you know,

12  available for Michiganders to get their license.

13  Q.  Right.  But it wasn't until after he was arrested with the

14  marijuana that he --

15  A.  Correct.

16  Q.  -- sought the license?

17  A.  Correct.

18  Q.  Right?  And he was going to present that to the judge to

19  explain why he was smoking the marijuana, right?

20  A.  Yes.

21  Q.  Yeah, okay.  Now, when you went to this restaurant, he told

22  you why you were going to the restaurant, right?

23  A.  Yeah.

24  Q.  What did he tell you?

25  A.  He basically said he's got to see somebody.

1  Q.  Okay.

2  A.  And --

3  Q.  What did he say he was going to see that person about?

4  A.  I know he was -- he got a phone call.  Like, I don't know

5  exactly.  I didn't know until after --

6  Q.  Okay.

7  A.  -- we left the restaurant.

8  Q.  Were you driving?

9  A.  No, I wasn't.

10  Q.  So the guy who had been smoking the marijuana was driving?

11  A.  Yeah.  He was driving.

12  Q.  Okay.  The guy who had just been charged a little bit

13  before, placed on probation for driving with marijuana, was the

14  one who was driving with marijuana; is that right?

15  A.  Correct.

16  Q.  Okay.  And did he tell you, hey, we've got to stop at this

17  restaurant because I need to talk to this guy?

18  A.  Yeah, in the conversation is similar to that, yeah.

19  Q.  And what did he say what he needed to talk to the person in

20  the restaurant about?

21  A.  He was telling me something about cars.  He, you know, said

22  he needs to talk to him about fixing his car or something.

23  Q.  Okay.  So if, during the conversation, he was engaged in

24  discussions other than the cars, he didn't relate that to you?

25  He didn't tell you about that?

1   A.   No.

2   Q.   After the meeting, did he tell you, hey, this is what we

3   talked about?

4   A.   No.  Well, he didn't tell me what they talked about.  No.

5   Q.   Okay.

6   A.   But I, like I remember asking him, you know, why are you

7   hanging out with this old guy.

8   Q.   Okay.  And what did he say?

9   A.   He told me I'm just trying to get in the car business with

10  him.

11  Q.   That's his explanation?

12  A.   Yeah.  That's what I -- what he told.

13  Q.   And if you had a discussion with him about anything else,

14  he didn't tell you?

15  A.   No.  Wouldn't have --

16  Q.   He kept that away from you?

17  A.   That's the only discussion we had.

18  Q.   Right.  But he didn't tell you if there was some other

19  discussion?

20  A.   No.

21  Q.   Okay.  So if there was something else, and he decided not

22  to tell you, you don't know about?

23          (Phone ringing in courtroom.)

24  A.   The conversation didn't come up.  You know, we didn't talk

25  about it.

1          THE COURT:  It's happens to one of you folks, it's a
2     $100.
3          (Laughter in courtroom.)
4          MR. WATERSTREET:  I was going to ask if I could, if I
5     could take it.
6          THE COURT:  I'll pay myself.
7          MR. WATERSTREET:  Okay.
8     BY MR. WATERSTREET:
9     Q.  And you were sure he was coming back because that's what he
10    told you?
11    A.  Actually, I mean, I've heard many phone conversations with
12    family members.
13    Q.  Okay.
14    A.  And he told me for sure, you know, I'll see you at, you
15    know, the day that he's coming back.
16    Q.  When did he say, tell you he was coming back?
17    A.  On the 3rd.
18    Q.  Of?
19    A.  May I think.  May 3rd or something like that.
20    Q.  He specifically told you that?
21    A.  Yeah.  It was like a couple months after he, he booked his
22    ticket.  The day of the 16th of March, when you know, we met up
23    that day.
24    Q.  Well, when did he book his ticket?
25    A.  To be honest with you, I don't know the exact date, but it

```
 1    was like a week before that.
 2    Q.  Two days before?
 3            MR. WEISS:  He said a week.
 4            THE WITNESS:  A week.  A week.
 5            MR. WATERSTREET:  I'm asking him.
 6    BY MR. WATERSTREET:
 7    Q.  Two days before, perhaps?
 8    A.  Honestly, I'm not sure.
 9    Q.  So it's not like he made up his mind he's going to go do
10    something?
11    A.  No.
12    Q.  And then bought the ticket and went?
13    A.  I know a week before he said I was going to Lebanon in
14    about a week, and I knew before, you know.
15    Q.  And where was he getting the money for this trip?
16    A.  I mean, I've never really asked him.  But you know --
17    Q.  He's unemployed, right?
18    A.  His family always helped him out, you know.
19    Q.  Excuse me?
20    A.  His family, most likely.
21    Q.  You think maybe from the family?
22    A.  Yeah.
23    Q.  He's unemployed, right?
24    A.  Yeah.
25    Q.  He hasn't held a job for how long?
```

ALI MOUNZER - CROSS

```
 1  A.  I know his last job was like a little bit over a month ago.
 2  Q.  Okay.  And who was that with?
 3  A.  I know he was working as an electrician for the last job
 4  he had.
 5  Q.  Who was he working with?
 6  A.  Honestly, I don't know the name of the person.
 7  Q.  And that's what the defendant told you?
 8  A.  I've known that because, you know, he would call me he's at
 9  work, stuff like that, you know.
10  Q.  Where was he working?
11  A.  I don't, I don't know.  Like I said, I don't know the exact
12  name of the business.
13  Q.  And the car he was driving when he went to this, went to
14  this restaurant, what kind of car was that?
15  A.  A red Cadillac.
16  Q.  Okay.  And does he also have a work van?
17  A.  From what I understand, yeah, he had one.
18  Q.  Okay.  Does he own any property?
19  A.  No, I don't, I don't think so.
20  Q.  No?  Did he recently sell any property?
21  A.  I know he was telling me that they had to sell a house
22  because they are buying a new one soon.
23  Q.  Okay.  He sold his house?
24  A.  I don't know the exact details, but you know it's probably,
25  I figured it was a family house, you know, the house they were
```

ALI MOUNZER - CROSS

 1   living in.

 2   Q.  When you would hang out with him, where would you go visit

 3   him?

 4   A.  Sometimes his house, you know, sometimes he would come over

 5   to my house.

 6   Q.  What's that address?

 7   A.  I don't have the physical address, but I know it's in

 8   Dearborn Heights off of Warren.

 9   Q.  Well, didn't they have two places right off of Warren,

10   right?

11   A.  I'm not sure.

12   Q.  One on Country Lane, right?

13   A.  Do you know the, the address?  I can --

14   Q.  Yeah.  6031?

15   A.  I honestly only know of one place.

16   Q.  Oh, okay.  So you don't know about any other place that he

17   owns that he just sold?

18   A.  No.

19          MR. WATERSTREET:  Okay.  Thank you.

20          MR. WEISS:  May I, Judge?

21          THE COURT:  Mr. Weiss?

22                      REDIRECT EXAMINATION

23   BY MR. WEISS:

24   Q.  After you and Hamdan were done in the restaurant, did you

25   go outside and did the owner of the restaurant accompany you

ALI MOUNZER - REDIRECT

1  outside?

2  A.  Yeah.

3  Q.  Did the, did Mr. Hamdan and the owner look at the car?

4  A.  Yeah.  I remember --

5  Q.  And did they talk about doing some repairs on the car?

6  A.  Correct.

7  Q.  And the repairs would be done in time when Mr. Hamdan

8  returned from Lebanon?

9  A.  Yeah.  I recall Mohammad telling the guy that he needs his

10 car fixed by the time he gets back so his sister could drive

11 it.

12         MR. WEISS:  Thank you.  Nothing further.

13         THE COURT:  Step down.

14         (Witness excused, 2:16 p.m.)

15         MR. WEISS:  If I may?  It will be my last witness,

16 your Honor.

17         THE COURT:  Ma'am, would you raise your right hand,

18 please.

19         (Witness is sworn.)

20         THE COURT:  Have a seat.  State and spell your name

21 for the record.

22         THE WITNESS:  My name is Hanan Abboud.  A-B-B-O-U-D.

23         COURT REPORTER:  Spell your first name, please.

24         THE WITNESS:  H-A-N-A-N.

25                         HANAN ABBOUD

1      called as a witness at 2:17 p.m., testified as follows:

2                        DIRECT EXAMINATION

3    BY MR. WEISS:

4    Q.  Are you Mr. Hamdan's sister?

5    A.  Yes.

6    Q.  Okay.  And when did you come to this country?

7    A.  In June 2007.

8    Q.  And are you a citizen?

9    A.  Yes.

10   Q.  Okay.  Do you know when your brother, Mr. Hamdan, came to

11   this country?

12   A.  With us in 2007.

13   Q.  Okay.  And are you aware of his health issues?

14   A.  Yes.

15   Q.  And would you relate to the Court what health problems he

16   suffers from?

17   A.  He has one lung is working and his other lung is almost

18   disabled.  And he has knees problem, and he has problem with

19   his fingers.  And his shoulder like dislocates sometimes when

20   he holds heavy stuff.

21   Q.  Okay.  Regarding his dental problems, did he try to have

22   them corrected here?

23   A.  Yes.

24   Q.  And what happened?

25   A.  My sister called, I'm not going to pronounce the doctor's

1   name.  And he, he said that it's for only one tooth, it's

2   between 400 and 900.  And he has like more than 12.  And to be

3   honest with you, we can't afford like paying this much.

4   Q.  When you say more than 12, more than 12 --

5   A.  Problem teeth.

6   Q.  -- problem teeth?

7   A.  Yeah.

8   Q.  And are you aware of what the cost would be to have the

9   teeth fixed in Lebanon?

10  A.  It's going to be a lot way cheaper than here.

11  Q.  Okay.  And you know that it's cheaper because?

12  A.  Because I did my teeth when I went in 2012 to see my

13  husband.

14  Q.  I see.  And how much cheaper was it for you?

15  A.  Like here, they told me it's 200.  There, I pay $30.

16  Q.  Okay.  Now, when did you become aware of the fact that your

17  brother wanted to go to Lebanon?

18  A.  He was, after his ex-girlfriend left him, he wanted to go

19  there, like for a vacation.

20  Q.  Okay.  When did his girlfriend dump him?

21  A.  August 2013.

22  Q.  Okay.  And how long had they been dating?

23  A.  For almost six years and they got engaged for four days.

24  Q.  And then she had a change of heart?

25  A.  Not she.  Her family forced her, like, to leave him.

1   Q.  Okay.  And has your brother ever talked about being a

2   Hizballah supporter?

3   A.  Never, no.

4   Q.  Has he ever indicated any desire to join Hizballah?

5   A.  Never, no.

6   Q.  Has he ever talked about it?

7   A.  No.

8   Q.  Has he ever supported it, to your knowledge?

9   A.  No.

10  Q.  Okay.  Now, when he started to talk about going to Lebanon,

11  when was that?

12  A.  After his fiancée left him.

13  Q.  Okay.  So --

14  A.  He wanted to go for a visit.

15  Q.  All right.  And what is your brother's status in this

16  country?

17  A.  Permanent resident, green card holder.

18  Q.  Okay.  And did he do anything in December of 2013 regarding

19  his status in this country?

20  A.  Yes.  I helped him apply for his citizenship.  Actually,

21  reapply for his citizenship.  I applied, me and him, my mom,

22  for the citizenship.  But for, for his application, they

23  required him to pay.  They accepted the waiver for me and my

24  mom.  They didn't accept the waiver for him.  So after they

25  sent back the application that he should pay the money, he

HANAN ABBOUD - DIRECT

1  couldn't afford it.

2  Q.  Okay.  So let's back up a little bit.

3  A.  Okay.

4  Q.  When did you, your brother, and your mother first apply for

5  citizenship?

6  A.  In 2012.

7  Q.  Okay.  And if I understood you correctly, you and your

8  mother applied for a waiver of the fees?

9  A.  Yes.

10  Q.  But they did not accept your brother's --

11  A.  Yes.  Correct.

12  Q.  -- request for a waiver?

13  A.  Correct.

14  Q.  So he had to get the money?

15  A.  Yes.

16  Q.  Okay.  And by December of 2013, did he have the money?

17  A.  No.  I went to, me and him, we went to some guy.  He help

18  us filling the waiver again and we sent it.  And they sent us

19  the approval letter that everything is waived; that you're

20  ready to proceed.

21  Q.  And when did you get the approval letter?

22  A.  In December because his bio -- his fingerprints was on

23  January 6, 2013.

24  Q.  2013 or 14?

25  A.  I'm sorry.  2014, this year.  Sorry.

HANAN ABBOUD - DIRECT

1    Q.  So in January, early January of this year, he went to the

2    Immigration and gave his fingerprints?

3    A.  Correct.

4    Q.  And did he have to give them anything else when he applied,

5    when he went in to give his fingerprints?

6    A.  For sure, yeah.  You have to give your -- the green card,

7    driver license, passport.  Three piece of ID.

8    Q.  So in January, he had his passport?

9    A.  Yes.

10   Q.  You weren't hiding his passport from him in January, were

11   you?

12   A.  No.

13   Q.  Did you ever hide it?

14   A.  No.  I used to have them in my safe, but I gave it to him

15   when he went to the -- to do the fingerprints.

16   Q.  You had a safe?

17   A.  Yeah, in my house.

18   Q.  And you would keep important papers there?

19   A.  Yeah.

20   Q.  And he asked you to put some of his important papers there?

21   A.  Yes.

22   Q.  And when he wanted them, did you keep them from him?

23   A.  No.

24   Q.  You always gave it to him?

25   A.  And he has the pass, password, I'm sorry, for the safe so

1  he can access it.

2  Q.  Oh, he has the combination?

3  A.  Yes.

4  Q.  Okay.  All right.  And then did something happen in March

5  of this year regarding his status, citizenship status?

6  A.  Yes.  In February 2014, they sent him a letter saying that

7  your interview in March 3rd for, for his test is cancelled.  We

8  never finished the processing.

9        I'm not sure.  I never read that good, but they said

10  they are going to schedule it.  And he -- I ask him to call

11  them.  Maybe they can help him do like a paper for him like to

12  go do the test in March.  But they said you have to wait and

13  we're going to send you a new letter.

14  Q.  Okay.  And so did your brother get that new letter?

15  A.  No, not yet.

16  Q.  Okay.  So he's still waiting for it?

17  A.  Yes.

18  Q.  But even as late as early March, just a few weeks ago, he

19  was still making plans and preparations to complete the

20  application for citizenship process?

21  A.  Yeah.  I was helping him study for his citizenship.

22  Q.  Okay.  When you say studying, what do you mean?

23  A.  Like, like memorizing the questions.

24  Q.  You mean like who the presidents are?

25  A.  Yeah.

1    Q.   And things like that?

2    A.   These questions, yeah.   The hundred questions.

3    Q.   All right.   And when was the last time that you and him

4    studied together?

5    A.   That was in February.

6    Q.   Okay.   And then he got the letter in March?

7    A.   For which letter?

8    Q.   You said something in early March.   Was it February --

9    March 3rd, something, did I misunderstand?

10   A.   The letter for him to go, they sent it in, maybe in January

11   for him to go, because they give you a month to prepare for the

12   test.

13   Q.   Okay.   All right.   Now, are you aware of the fact that your

14   brother had two vehicles?

15   A.   Yes.

16   Q.   One was a Cadillac?

17   A.   (Nodding head.)

18   Q.   Was it an old Cadillac?

19   A.   It's a 2005 Cadillac.

20   Q.   Okay.   It has a lot of miles on it?

21   A.   95,000 I believe.

22   Q.   Okay.   And did it need some bodywork?

23   A.   Yeah.

24   Q.   Okay.

25   A.   It got hitted twice.

HANAN ABBOUD - DIRECT

1   Q.  Pardon?

2   A.  It got hitted twice when they, my sister and him backing

3   up.

4   Q.  Okay.  And so it needed some bodywork?

5   A.  Yes.

6   Q.  Now, did your brother tell you anything about that he was

7   making arrangements to get the bodywork done while he was

8   overseas?

9   A.  Yes.

10  Q.  And what did he tell you?

11  A.  He told me if it's going to be expensive, because Cadillac

12  parts are really expensive, he said that we can call the one

13  who we bought it from and we can get it exchanged and we can

14  give him the van he, he has.  It's in my driveway now.  So he

15  told me you can give this to him and that, but when I come

16  back, we'll do the (unintelligible).

17  Q.  So he was going to ask you to sell the van?

18  A.  No.

19  Q.  Or give, use the van to help pay for the cost of repairing

20  the Cadillac?

21  A.  He said when I come back, we'll do this.

22  Q.  Oh, when he comes back?

23  A.  Yeah.

24  Q.  Okay.  And why was it that he didn't care about or why was

25  it that he felt it was okay to sell the van?

HANAN ABBOUD - DIRECT

1   A.   Because once when he got the van, he, he used to work with

2   Dish Network installation, and he thought that he could make

3   good money if he buys his own stuff to do it.  But Dish Network

4   installation now, it's, the work is not that good.

5   Q.   So --

6   A.   There is no work with --

7   Q.   So he wasn't getting enough work to justify two vehicles?

8   A.   He didn't even get one job.

9   Q.   Okay.  All right.  And were you aware of the fact that he

10   was on probation?

11   A.   Yes.

12   Q.   In the 20th District Court in Dearborn Heights?

13   A.   Yes.

14   Q.   And are you aware of the fact that he had to take some

15   classes as part of his probation?

16   A.   Yes.

17   Q.   And did he ask you to help your sister to help him while he

18   was gone?

19   A.   Yes.  He asked me to others and mail in form.  He has to

20   send it each month.  He signed like four of them.  And he said

21   that I have to send it each month, and they are going to send

22   us a letter that we have to pay $65 once he get his medical

23   card.

24   Q.   So Probation was aware of the fact that he applied for a

25   medical marijuana card?

```
 1   A.  Yes.
 2   Q.  Okay.  And Probation was aware of the fact that he was
 3   going to go overseas, correct?
 4   A.  Yes.
 5   Q.  But they still wanted something sent in each month?
 6   A.  Yes.
 7   Q.  Okay.  And was there some classes that he had to take once
 8   he got back?
 9   A.  I'm not sure.
10   Q.  Okay.  So you don't know about scheduling any classes for
11   when he got back?
12   A.  I know that he went a couple times, but I'm not sure if
13   there's classes.
14   Q.  Okay.
15   A.  Yeah.
16        MR. WEISS:  All right.  Thank you, your Honor.  I
17   don't have anything further.
18        THE COURT:  Mr. Waterstreet.
19        MR. WATERSTREET:  Yes.  Thank you, your Honor.
20                      CROSS-EXAMINATION
21   BY MR. WATERSTREET:
22   Q.  I believe you said towards the beginning of this year, your
23   brother went to get his fingerprints and he took his Lebanese
24   passport with him?
25   A.  Correct.
```

HANAN ABBOUD - CROSS

1    Q.   What happened to that passport after that?

2    A.   Maybe he misplaced it.

3    Q.   Do you know what happened to it?

4    A.   I don't know, no.

5    Q.   You don't have it?

6    A.   No, I don't.

7    Q.   How long has he had this Cadillac?

8    A.   Less than a year.  I'm not sure exactly, but less than a

9    year.

10   Q.   It's now March.  Did he have it in around, well, December?

11   A.   Yeah.

12   Q.   Did he have it back in October?

13   A.   Yeah.

14   Q.   Did he have it back in September?

15   A.   I'm not sure.

16   Q.   Okay.  So he had it at least in October?

17   A.   Yeah.  He had it in October.

18   Q.   What about the van?  How long has he had that van?

19   A.   Like four to five months.

20   Q.   Okay.  So that would be around November time?

21   A.   Yes.

22   Q.   Or November?  Or October, November?

23   A.   I'm not sure exactly about the dates, but I know like it's

24   four to six months.  Like I'm not sure exactly.

25   Q.   All right.  And what about the house he owned?

HANAN ABBOUD - CROSS

1    A.   Which one?

2    Q.   The one he just sold.

3    A.   He, he, he's the owner -- well, he used the owner of this

4    house for four years, almost four years.

5    Q.   Okay.  And he just sold that, just before he was about to

6    leave, right?

7    A.   Yes.

8    Q.   And that was a house on Country Lane?

9    A.   Correct.

10   Q.   And how much money did he get out of that?

11   A.   He got 16,000.  He paid the taxes, cause he didn't have the

12   money to pay the taxes.  He paid the association fee because

13   it's a condominium.  And he paid for his ticket, and the lawyer

14   and he paid for my taxes, for my house, and his mother's house.

15   Q.   Okay.  And how, how much money did he have left over for

16   this vacation?

17   A.   He didn't want to spend all his money, because we were

18   planning to get a new house, but I'm not sure like how much

19   money is left.

20   Q.   He left the money with you, though?

21   A.   Yeah.  But I'm not sure how much.

22   Q.   Well, how much did he leave with you?

23   A.   Maybe it's about 7,000.

24   Q.   Okay.  And you said that you helped him fill out this form

25   so that he could get a waiver because he couldn't afford it?

 1  A.  Correct.

 2  Q.  Okay.  Does your brother have a job?

 3  A.  He stopped working like a month ago.

 4  Q.  But you told the probation department that he's unemployed

 5  and has no significant work history, and hasn't worked for five

 6  years.

 7  A.  I never spoke to a probation department.

 8  Q.  You're Mrs. Abboud, aren't you?

 9  A.  Yes.

10  Q.  And Mrs. Abboud affirmed the defendant is financially

11  supported by your mother?

12  A.  Can you repeat the question, please?

13  Q.  Mrs. Abboud affirmed that the defendant is financially

14  supported by his mother.

15  A.  Correct.

16  Q.  And that he's been unemployed for five years and two

17  months.

18  A.  When was it?  Like I never, like, spoke to anyone in the

19  probation.  You mean the 20th District Court?

20  Q.  Defendant reported and his sister confirmed --

21          THE COURT:  I think we're talking about a

22  representative of this court, a Pretrial Services person from

23  this court.

24          THE WITNESS:  From this court, I never spoke to

25  anyone.

HANAN ABBOUD - CROSS

1   BY MR. WATERSTREET:

2   Q.  Okay.  How many sisters does Mr. Hamdan have?

3   A.  Two.

4   Q.  Your other sister testified you're the one who spoke to

5   probation.

6           MR. WEISS:  Your Honor, excuse me.  I, I think her

7   testimony was she didn't.  She didn't know whether her sister

8   did.

9           THE COURT:  That's true, but let's --

10          MR. WEISS:  Okay.  So I --

11          THE COURT:  Let's explore whether, who they talked to

12  and who they didn't.

13  BY MR. WATERSTREET:

14  Q.  Okay.  If you two were the only two sisters, and neither

15  one of you spoke to Probation, I'm trying to find out the fact

16  that his sister confirmed he is unemployed with no significant

17  work history.

18  A.  I never spoke to any probation officer.  I, I just spoke to

19  the FBI in the airport.  There was no probation officers.

20  Q.  So somebody has perpetrated a fraud with the court?

21          MR. WEISS:  With all due respect --

22          THE COURT:  No.  No.  We're not going to have her

23  speculate --

24          MR. WATERSTREET:  All right.

25          THE COURT:  -- on fraud.

1            MR. WATERSTREET:  Do you have --

2            THE COURT:  You spoke to an FBI agent?

3            THE WITNESS:  Only when, when I went to the airport

4     and they informed me that the FBI is holding your brother.  I

5     never spoke to any probation officer or anyone in this court.

6            THE COURT:  Did you ever speak to someone, and it's

7     actually not a probation officer, Pretrial Services officer,

8     named Homero Hinojosa?

9            THE WITNESS:  No.

10           THE COURT:  Did you ever speak to anyone on the

11    telephone --

12           THE WITNESS:  No.

13           THE COURT:  -- that --

14           THE WITNESS:  No one.

15           THE COURT:  -- represented they were from the court

16    seeking information?

17           THE WITNESS:  Never.

18           THE COURT:  Did you ever speak to anyone concerning

19    whether Mr. Hamdan resided with his mother and younger sister?

20           THE WITNESS:  Only to the FBI agents.

21           THE COURT:  Okay.  Go ahead.  I think there may be

22    some confusion about who she spoke to.

23    BY MR. WATERSTREET:

24    Q.  Well, you are Mrs. Abboud, affirmed that your remaining

25    family ties in this district include your parents, you, and

1    your sister?

2    A.  Correct.

3    Q.  Okay.  And your phone number is area code (313) 663-0661?

4    A.  Correct.

5    Q.  And you don't recall speaking to the Probation Department?

6            MR. WEISS:  Asked and answered about four times, your

7    Honor.

8            THE WITNESS:  I can show my phone bill.  I never spoke

9    to anyone.

10           MR. WEISS:  No.  There's no question.

11           THE COURT:  Yeah.  You know, I'll let her answer it

12   one more time.

13           THE WITNESS:  I never --

14           THE COURT:  You don't recall talking to any --

15           THE WITNESS:  I swear that I never spoke to anyone in

16   the probation or from this court.  No one contact me by phone.

17   Only my brother from the prison.

18           THE COURT:  Okay.

19   BY MR. WATERSTREET:

20   Q.  Has anybody else held themselves out as, as a sister?

21   A.  No.

22   Q.  In your family?

23   A.  Um-umm.

24   Q.  You say he was employed up till last month.  What was he

25   doing up till a month ago?

1   A.   He was like in between jobs.  He used to work as an
2   electrician with a guy, but like he couldn't even like hold
3   anything.  So every time he like has to hold something, like to
4   give it to this guy, his shoulder dislocate.
5   Q.   And --
6   A.   And --
7   Q.   Excuse me.  Who is this guy that he works with?
8   A.   His name is Ahmad.
9   Q.   Ahmad?
10  A.   Yes.
11  Q.   What's Ahmad's last name?
12  A.   A-L-S-A-A-D-Y.
13  Q.   Al-Saad?
14  A.   Al-Saady.
15  Q.   And if we spoke to Mr. Al-Saady, he would say how long ago
16  did your brother stop working for him?
17  A.   He, like three months ago.
18  Q.   Five months ago, maybe?
19  A.   Three months ago, I'm sure.
20  Q.   You're positive about that?
21  A.   Yeah.
22  Q.   Did you ever go to your brother's work site and see him
23  work?
24  A.   He used to come to my store.  No, I don't.  No.
25  Q.   Did you ever go to your brother's work site and see him

HANAN ABBOUD - CROSS

1  work?

2  A.  No.

3  Q.  So the story about his shoulder being dislocated is based

4  on what your brother tells you, right?

5  A.  No.  Because I see him when he comes back, his shoulder is

6  dislocated.

7  Q.  How long has your brother -- your brother owned this house

8  for how many years before he sold it just, just --

9  A.  In 2010.  So it's, it's less than four years, like four

10  years, almost four years.

11  Q.  And he just closed it at the end of last month, right?

12  A.  In February 28th.

13  Q.  28th.  Just before he was taking his trip.  He sold his

14  house, right?

15  A.  Mh-hm.

16  Q.  Yes?

17  A.  He did sold his house on February 28, yes.

18  Q.  And he's talking to somebody about maybe selling the van,

19  correct?

20  A.  I'm not sure.  He, he just told me that he wants to sell it

21  when he comes back.

22  Q.  Okay.  And you said you helped him fill out these forms.

23  And I just want to ask you, show you the form here.

24  A.  Mh-hm.

25  Q.  Just give me a second so I can find it.

HANAN ABBOUD - CROSS

1           Here it is.  When your brother lives with -- your

2     brother lives with your mother, right?

3     A.  Yes.

4     Q.  Does he pay rent?

5     A.  Yes.

6     Q.  How much does he pay a month?

7     A.  He used to help her paying his other -- her rent.  Her rent

8     is like $450.

9     Q.  450 a month?

10    A.  And plus association fee for 200.

11    Q.  So 600 a month?

12    A.  650.

13    Q.  650 a month?

14    A.  Yes.

15    Q.  How much does he pay of that?

16    A.  I'm not sure exactly what, what he pays.  But I know that

17    he, when he used to work, he used to help her.

18    Q.  Okay.  But when, let's say we go back, I don't know, let's

19    say back in October, was he working then?

20    A.  In October?  Yeah, he was working.

21    Q.  Okay.  And how much was he contributing to the rent?

22    A.  Can you repeat the question, rephrase it?

23    Q.  How much was he giving your mother for rent back in

24    October?

25    A.  I'm not sure.  I don't live with them.

HANAN ABBOUD - CROSS

1   Q.  How much was he contributing for food?

2   A.  I'm not sure.

3   Q.  A dollar?  $10?  $50?

4   A.  I'm not sure because I don't live with them.  Like daily

5   basis, I don't live with them.

6   Q.  Do you ever talk to your mother about your brother?

7   A.  Yeah.

8   Q.  How he's lazy and he just lays around and smokes marijuana

9   all the time?

10  A.  Yes.

11  Q.  That's what she says?

12  A.  Yes.

13  Q.  Okay.  Does he help with the utilities?

14  A.  When he used to work, he used to help her with the money

15  for like paying all the bills.  But I'm not sure exactly what

16  bills.

17  Q.  Okay.  And was your brother going to school back then?

18  A.  He was going to Everest.  It's not like a school.  He was

19  trying to get his GED.

20  Q.  Was he going to school back in October?

21  A.  I'm not sure about the dates, no.

22  Q.  Okay.  I want to show you a form.  And I'm going to see if

23  you recognize your brother's signature.  I'm going to show you

24  a document.

25          MR. WATERSTREET:  Your Honor, I'm going to have to

```
1    make a copy of this and have it marked, if I may.  I didn't
2    know Counsel was going to be going into this issue.
3             THE COURT:  Go ahead.
4    BY MR. WATERSTREET:
5    Q.  Do you recognize this, this signature here?  Well, let me
6    -- do you recognize the name printed underneath?
7    A.  Yeah.  That's his name.
8    Q.  Mohammad Hamdan?
9    A.  Yes.
10   Q.  Do you recognize the signature?
11   A.  It's almost the same.
12   Q.  Is that your brother's signature?
13   A.  Yeah.  It's almost the same.
14   Q.  And the date here, 11/11/2013?
15   A.  Correct.
16   Q.  Okay.  Your brother told the authorities that he couldn't
17   afford to pay this, this fee.  And this is the form you helped
18   him fill out, because he had to pay rent of $800 per month,
19   right?  That's what it says there, right?  $800?
20   A.  It's 650.
21   Q.  But that's true that it says rent here, $800?
22   A.  Yeah.
23   Q.  And it says food, $200, correct?
24   A.  Yes.
25   Q.  And it says utilities, $500, correct?
```

1    A.   Yes.

2    Q.   And it says medical, $300, correct?

3    A.   Yes.

4    Q.   And it says school, $50, correct?

5    A.   That's a student loan.

6    Q.   Right.  And it says every month, he has to pay $1,850, he

7    can't afford it, correct?

8    A.   Yes.

9    Q.   Okay.  Then there's another page that says to list all his

10   assets.  Do you see that page?  Line 15, list your assets and

11   value of your assets?

12   A.   Mh-hm.

13   Q.   Do you see that?  Yes?  Do you see that?

14   A.   I never --

15   Q.   This is --

16   A.   I never like read it before.

17   Q.   Okay.  So you helped him fill this out, but you didn't read

18   it?

19   A.   He filled it in, like, the computer.  But I'm not sure

20   like, let me tell you something.  When I, when my and --

21   Q.   Ma'am, the question is --

22   A.   This is not filled.

23   Q.   Excuse me, ma'am.  The question is line 15, list your

24   assets and value of your assets.  Is that what that says?

25   A.   Yes.

1  Q.  And there's -- it's left blank, correct?

2  A.  Correct.  Yes.

3  Q.  You've already testified that your brother, back in October

4  at least, he had a van, he had a Cadillac, and he had a house,

5  correct?

6  A.  Yes.

7  Q.  And then describing his financial hardship, he says, "I'm

8  currently a student.  I'm over 18 and I don't get any help from

9  the government.  My mother does, and my sister, they get food

10  stamps.  My sister helps with the payments."

11        Is that you --

12  A.  Yeah.

13  Q.  -- that get food stamps?

14  A.  No.  My sister, the one she lives with them.

15  Q.  Okay.  So when he filled out this form to the government,

16  based upon the fact he didn't list any of his assets, he was

17  lying, correct?

18  A.  No.  He was not lying.  It's his first time he's filling

19  this.

20  Q.  But you helped him with this?

21  A.  Yeah.  But I never -- like he's the one that typed that

22  one.  But he doesn't know what "assets" mean.  He's not that

23  good in English.

24  Q.  Okay.  But that's why you helped him?

25  A.  I helped him fill the application.

1   Q.  Okay.

2   A.  But with this, we had to go to someone to help him.

3   Q.  Would you be hysterical to find out your brother was going

4   to join Hizballah?

5   A.  Oh, yes.  Yes.

6   Q.  Okay.

7          MR. WATERSTREET:  Nothing further.  Thank you, your

8   Honor.

9          THE COURT:  Mr. Weiss?

10                         REDIRECT EXAMINATION

11  MR. WEISS:

12  Q.  Was your brother joining Hizballah?

13  A.  No.

14  Q.  Were you hysterical over something that wasn't going to

15  occur?

16  A.  He told me will you be hysterical, like if I --

17  Q.  No.  I understood his question.  I just --

18  A.  If he -- yeah.

19  Q.  Let me ask you something.  In your mind, is there something

20  different between filling out an application for citizenship

21  and filling out a form for a waiver of the fees?

22  A.  Yes.

23  Q.  Okay.  You helped your brother with the citizenship

24  application, correct?

25  A.  Correct.

HANAN ABBOUD - REDIRECT

1  Q.  I believe your testimony on direct was, is he went to

2  someone to fill out the waiver of the fee, correct?

3  A.  Correct.

4  Q.  That was not you?

5  A.  No.

6  Q.  That was somebody that he went to?

7  A.  Yes.

8  Q.  Okay.  Now, you also indicated that some of the monies that

9  he got when the house was sold went to pay taxes?

10  A.  Correct.

11  Q.  Income taxes?

12  A.  No.  Like the taxes you pay for the house, the summer,

13  summer and winter tax.

14  Q.  Okay.  And the association fees?

15  A.  Association fee, it's due each month.

16  Q.  Okay.  So he was paying his taxes?

17  A.  Yeah.

18  Q.  Because obviously he couldn't pay them while they were

19  being accrued, correct?

20  A.  Correct.  Yes.

21  Q.  Because he didn't have the money?

22  A.  Correct.

23  Q.  But once it was sold, he paid them off?

24  A.  Correct.

25  Q.  Okay.  Thank you.

```
 1            MR. WEISS:  Nothing further.

 2            THE COURT:  Step down, ma'am.

 3            (Witness excused, 2:45 p.m.)

 4            MR. WATERSTREET:  I have no additional witnesses.

 5            THE COURT:  Mr. Weiss, do you have anything else?

 6            MR. WEISS:  I've represented to the Court that she

 7    would be my last one and I'll abide by that.

 8            THE COURT:  And, Mr. Waterstreet, do you have any, any

 9    rebuttal witnesses?

10            MR. WATERSTREET:  I have argument, Judge.  We've,

11    we've taken more than enough of this Court's time.  I just want

12    to get --

13            THE COURT:  That's why we're, that's why we're here,

14    Mr. Waterstreet.

15            MR. WATERSTREET:  Okay.

16            THE COURT:  Proceed with argument.

17            MR. WATERSTREET:  Okay.  Thank you, your Honor.

18            The statute, as the Court is well aware, is 18 USC

19    3142.  And subsection (e)(3) says there's a rebuttable

20    presumption.  And this, this case has that presumption.  It's a

21    presumption case, your Honor.  It's one of the offenses that's

22    listed under Section 2332b(g)(5)(B) of Title 18.  And since the

23    defendant is charged with being a -- attempting to provide

24    material support to a foreign terrorist organization under

25    Section 2339B, it falls under that presumption.
```

```
 1              The question is, there are several factors the Court
 2    is to consider.  The nature and circumstances of the crime.
 3    And one of those within that purview of nature and
 4    circumstances of the crime, the legislature specifically
 5    pointed out the Court is to additionally consider to the
 6    presumption whether the offense that is charged is a federal
 7    crime of terrorism, which it is, which would weigh against him.
 8              And the weight of the evidence against the person, and
 9    the Government propounds that it is great.  We have two
10    recorded conversation which the defendant clearly expresses his
11    desire to travel to Lebanon to join the Party of God,
12    Hizballah, to go fight in Syria.  He was specifically,
13    according to the transcripts, discouraged by his own family
14    members.  He was specifically discouraged by the source.  And
15    he was specifically told the United States considers Hizballah
16    as a terrorist organization.  And the defendant's response to
17    that is, I've made up my mind.  You're talking to a dead man.
18    I've made up my mind.
19              The defendant was stopped at the Detroit Metropolitan
20    Airport prior to boarding the first leg of his trip to Lebanon.
21    The defendant just sold his house last month, closed on it
22    within a few weeks of his travel.  He packed up all his
23    possessions based upon the testimony of the agent.  Was giving
24    his car to his sister, as is pointed out in the transcript.
25    Asked for someone to help him sell his van and give the money
```

```
 1   to his family.

 2          He has a Facebook page, in which he has a female

 3   holding a machine gun saying Hizballah girls make us proud.

 4          He bragged, at least to the source, I know defense

 5   counsel argues otherwise, but it's clear in the defendant's own

 6   language that he was part of Hizballah as a youth back in 2006.

 7   And his explanation of why he was going was to have a good time

 8   and get his teeth fixed.

 9          Your Honor, we have to be realistic about where, where

10   the Eastern District of Michigan is.  The defendant -- we're

11   very close to the Canadian border.  Once he's in Canada and

12   once he makes his way back to Lebanon, we have no control over

13   getting him back here to the United States, because there's no

14   extradition treaty.

15          He's already -- we don't know where his passport is

16   right now.  We know he was traveling on a temporary passport.

17   That passport may turn up and he may be able to use that

18   passport to travel.

19          Look at the character of the person.  Your Honor, I

20   don't know how -- I'm somewhat confused based upon what I

21   proffered to the Court, based upon what Pretrial Services'

22   investigation was, is that he's been unemployed for five years.

23   And based upon some recent testimony, supposedly by the person

24   that told Probation Department he hasn't been working for more

25   than five years, that he's now somewhat employed; maybe last
```

1   time he worked was three months ago.

2          Everybody agrees that he's lazy, smokes marijuana.

3   And we even heard the defense own witnesses agree that, in

4   essence, he's violated probation.  He smoked marijuana on the

5   16th.  He was placed on probation.  Specific order of the court

6   is not to violate or commit any new offenses.  And his own

7   witness admitted that he was the one who was driving after they

8   smoked marijuana.

9          Family ties.  The Government agrees that his, his

10  father, his mother, his sisters, his aunts and uncles all live

11  here in this, the Eastern District.  However, that's not the

12  issue.  The issue is do they have the ability to inhibit him

13  from going to Lebanon.  And we can just look at the, at the

14  transcripts to find out the answer to that question.  The

15  answer is no.

16         They are the ones who would be hysterical if they

17  found out that he was going.  They are the ones who discouraged

18  him from joining Hizballah.  But despite that, he said, "I'm

19  making up my own mind.  I've made the decision I'm going to go.

20  They've told me to forget about the subject, they want to make

21  me forget.  They tell me to stay at the house, do nothing,

22  don't work.  Just stay here.  I know my parents took my

23  passport, but they know I'll get another one."  And he did.  He

24  went and got the temporary passport.

25         "My uncles tried to convince me not to go.  I

1   appreciate what they said.  I listened to them.  But I cannot

2   take your advice, because in the end, it is my decision and not

3   anyone else's.  I will be executing the matter.  I will be the

4   one to lose, and no one else is going to lose."

5          And then on page 2 of the transcript of March 16th,

6   the source asked the defendant, "Did you tell your mother you

7   were going to join Hizballah, the party?"  He says, "Well, I'm

8   going to go talk to my father now.  Did you tell him you're

9   going to fight?  No.  I didn't tell him."

10         Does he have extended family over in Lebanon that

11  could help him?  Well, counsel has already pointed out that his

12  sister indicated, according to the transcript, her willingness

13  to send over money.  She's admitted that he has more than

14  $7,000 available to him that she could send over there.  But

15  the defendant also said I have my uncle's family.  I have the

16  whole world over there.  I have more people than here.

17         I was going to argue employment, Judge, but frankly, I

18  don't know what the heck the answer is to employment.  It is so

19  unclear based upon what somebody told Probation Department

20  versus the testimony we've heard here today.

21         Community ties.  Well, he severed them.  He sold his

22  condo in Dearborn.  He asked the source to help him sell his

23  Cadillac and to help buy his sister a BMW.  He was temporarily

24  living at the Garling address and his room has been cleared

25  out.

DETENTION HEARING - 3/25/2014

1          A record of drug abuse, I think that's rather clear,

2     Judge.  We have him abusing drugs all the way back to 2000,

3     more than eight years, according to defense witness.  It wasn't

4     until after he got caught with the marijuana that he then

5     decided to seek a medical marijuana card.

6          I could go on and on.  We've gone over many a times

7     why he's going to become a member of Hizballah.  But I just ask

8     the Court to take into consideration the context of the

9     conversations, and the presumption, and the fact that we're no

10    clearer now than we were before we started about the

11    defendant's employment.  And frankly, your Honor, he has done

12    everything within his power to sever his ties here to this

13    district.

14         Thank you.

15         MR. WATERSTREET:  Thank you.

16         MR. WEISS:  Your Honor?

17         THE COURT:  Mr. Weiss?

18         MR. WEISS:  If I understood the Court correctly, the

19    Court indicated it was going to review the transcripts?

20         THE COURT:  I am.

21         MR. WEISS:  Okay.  So I don't know if the Court is

22    going to make a ruling now or wait to look at the transcripts.

23         THE COURT:  I'm not going to make a ruling now.

24         MR. WEISS:  Okay.

25         THE COURT:  I want to look at these transcripts

```
 1   carefully.  Certain excerpts --
 2            MR. WEISS:  Thank you.
 3            THE COURT:  -- were presented.  I want to look at the
 4   whole thing.
 5            MR. WEISS:  Thank you.  I appreciate that and I'll
 6   direct my remarks accordingly.
 7            I recognize that the Rules of Evidence at these types
 8   of proceedings are somewhat lax.  But with all due respect to
 9   the Government, clairvoyance doesn't come within that rubric.
10            Mr. Waterstreet accused my client of violating his
11   conditions of probation.  I'm not sure what conditions he
12   violated, because his probation officer knew that he was
13   getting a medical marijuana card.  There's only one reason to
14   get a medical marijuana card, and that is to be able to utilize
15   medical marijuana.
16            And as I prefaced my remarks when I first presented
17   the letter from the district judge, I don't have access to the
18   file and I was not counsel of record.  But I will represent to
19   your Honor, as an attorney and officer of the court, that I
20   have a number of state cases where individuals have been
21   charged with a variety of crimes, in fact, convicted, have been
22   placed on probation, and with a medical marijuana card, have
23   been authorized to use marijuana while they are under the
24   court's jurisdiction.  So I object to the quantum leap that Mr.
25   Waterstreet would have the Court engage in.
```

```
 1              I'm also perplexed, if he was so bent on severing his
 2     ties why he would get permission to travel and come back.  I'm
 3     sure, even though I don't have access to the transcript, he
 4     didn't tell the judge, your Honor, I'm going to fight
 5     Hizballah, I'm going to die.  I'm not going to come back, but
 6     let me go anyways.
 7              There is only one reason, one logical reason that he
 8     would broach the subject of traveling out of the country with
 9     the judge, and that was to get permission.  So when he comes
10     back, he won't be in violation of his probation.  His sisters
11     confirm that they had made arrangements with his classes, to
12     see to it that he would continue on with his probation.
13              Why does he pay off his taxes and do everything else
14     when he sells his house?  He can't live in it.  He's going to
15     be gone for a couple of months.  He's not severing his ties.
16     The people here in this courtroom belie the assertion or the
17     accuracy of the assertion that he is severing ties with his
18     family.
19              To accuse Mr. Hamdan of being a member of Hizballah as
20     a child is ludicrous.  If anything, it says that he was a
21     traffic security police.  And the testimony is, is that there
22     is a government in Lebanon, distinct and apart from Hizballah,
23     and that they have neighborhood watch people that has nothing
24     to do with Hizballah.  And even then, we question whether the
25     accuracy of that.
```

1          And the reason that I am pleased that the Court will

2    review the transcript is, and why I asked some introductory

3    questions of the agent as to why the source was doing this, was

4    to get out from his own difficulties.

5          And I trust when the Court reads the transcript, as

6    inaccurate as it may be, but when the Court reads the

7    transcript, and you see him talking about a car and the milage

8    and the navigation, and it needs to be fixed, and the source

9    interjecting, are you going down there.  And the source is

10   trying to get him into Hizballah.  And what does he say?  They

11   won't take me.  And the source says, well, we can pull strings,

12   we can get connections.  I don't want connections.

13         So the source does everything in the source's power to

14   get him to acknowledge I am joining Hizballah.  And it's never

15   on the transcript.  It's never on the tape.  I am going to

16   fight for Hizballah.  It's never on the transcript.  It's never

17   on the tape.

18         Yes, it is dangerous.  I have my youngest daughter in

19   Italy in a semester, I'm concerned about it.  Him going to a

20   place where there is a civil war, not to fight, but go to the

21   shrine, a religious shrine.  So the concern was not that he was

22   going to fight and die, but simply that he was going to an area

23   that carries an element of danger with it.  And that is not

24   proscribed by the statute.  I don't know what material support

25   he was providing.  I don't know what his -- where it shows that

 1   he had the intent to do anything.

 2           He's simply talking about what's going on in Lebanon

 3   and in Syria.  He's not happy that members of his religion are

 4   being slaughtered.  But he doesn't say I'm going to avenge

 5   them, I'm going to fight for them.  He doesn't say any of that.

 6           And he is somewhat philosophical about whether I come

 7   back.  He is dead to the assertion that he is going.  He is not

 8   dead that he is dying and that he is going to lose his life.

 9           Why talk about his car when he comes back?  Why get

10   permission of the court?  Why tell everybody that he's coming

11   back?

12           And where have they demonstrated that the two reasons

13   that he told the agent, dental work and a cell phone to be

14   repaired, is not true?

15           Where does it show that he didn't break up after a

16   six-year relationship and was a little bit melancholy about it

17   and just wanted to see the world, get a new atmosphere?  And

18   then what does he tell the source?  He is coming back.

19           I submit to you, I know this isn't the preliminary

20   examination, but I really question -- this is by complaint.

21   The grand jury has not even opined upon this.  There is no

22   indictment.  There is no presumption.  There, there should be

23   nothing here.  With all due respect, there should be conditions

24   and a combination of conditions.

25           THE COURT:  If I were, if I were as part of this

1    hearing, this legal question, as part of this hearing to find

2    probable cause, notwithstanding anything that might happen at

3    the preliminary examination, would you agree that it would be a

4    presumption case then?

5              MR. WEISS:  There is no grand jury.  I would dispute

6    that, just for the record.

7              THE COURT:  Well, there's often we have people here,

8    for example, on controlled substance offenses where they are in

9    a complaint.  And if the Court finds probable cause, that's all

10   that's required to trigger the presumption.

11             MR. WEISS:  I don't want to quarrel with the Court.  I

12   take the position that there is --

13             THE COURT:  There has to be a predicate finding of

14   probable cause, I agree, but it doesn't have to be from a grand

15   jury.

16             MR. WEISS:  I'm not going to quarrel with the Court.

17   I'm simply asserting the obvious, that we have an agent that

18   has been told what's on the tapes, whether it's accurate or

19   inaccurate.

20             But the cold hard reality is on the basis of the

21   transcripts before the Court, he doesn't say I am joining

22   Hizballah.  He doesn't say I am supporting Hizballah.  I am

23   going to do something for Hizballah.  I am going -- none of

24   that.  If anything, it's simply First Amendment banter between

25   two acquaintances about what's going on, and what I may not do

UNITED STATES vs. HAMDAN - 14-30120

DETENTION HEARING - 3/25/2014

```
1    and what this and that.
2         And there's a term that guys use about BS'ing, but I
3    won't say it in a courtroom in terms of what went on here.  And
4    that's why I welcome your Honor to take a look.
5         He's talking about cars, dealing with the shrine,
6    dealing with his personal life, and you've got the source that
7    is doing everything in his power to bring it in within the
8    parameters of the statute.  It's not there.
9         THE COURT:  Hang on a second.  I want to ask a
10   question.  And I'd like you to address the question of -- I
11   understand you're talking about, your position is that the
12   strength of the Government's case isn't there.  But what
13   conditions could I set that would reasonably assure that Mr.
14   Hamdan is not going to flee; that he's going to appear in court
15   when he's required to?
16        MR. WEISS:  GPS tether, where you'll know where he's
17   at, at every second.  I know we've already broached the subject
18   of property.  But it nonetheless demonstrates that these
19   people, that this community that he has supposedly severed ties
20   from are willing to put up their own homes.  Not just vacate
21   pieces of property or their summer homes in Miami.  Where they
22   live and their families live day in and day out, to put them
23   up, to demonstrate that they know he wasn't joining Hizballah;
24   that he wasn't going there to be a freedom fighter or any other
25   type of fighter.
```

DETENTION HEARING - 3/25/2014

```
 1            So I think in terms of GPS tether, his parents are
 2   here, if you want a third-party custody.  And if he's
 3   demonstrated to the jurist in Dearborn Heights that he can be
 4   trusted, I think with all due respect, that's an indication
 5   too, because that jurist knew what was going on, Probation
 6   Department knew what was going on, and they still authorized
 7   it.
 8            THE COURT:  What about Mr. Waterstreet's argument
 9   that, you know, we're just across the river from Canada, he
10   cuts the tether off, gets a passport and, and --
11            MR. WEISS:  If we what-if ourselves to death, and the
12   act does not require 100 percent guarantee.  It's only
13   reasonable probability.
14            THE COURT:  Correct.
15            MR. WEISS:  But if we use that "what if" argument, I
16   don't want to be presumptuous, but I don't know how many people
17   then would never get out in this district, because admittedly,
18   the bridge and the tunnel aren't that far away.
19            And I don't know if anyone that comes before your
20   Honor or the other individuals that are on this bench that are
21   similarly situated could ever have that 100 percent guarantee.
22            Mr. Waterstreet could use that for a jaywalking
23   offense.  There's the bridge.  There's the tunnel.  Snip, snip
24   and they are going.
25            THE COURT:  I think his argument was, was twofold.
```

DETENTION HEARING - 3/25/2014

1   One, obviously any, any defendant in this court has proximity

2   to Canada, I understand that.  But you have proximity to

3   Canada, plus family ties in Lebanon.

4           MR. WEISS:  What family ties does he have there?  He

5   mentions an uncle.  His family is here.  His sister indicated

6   that they all came here, what was it, 2007.  He doesn't have

7   any close family left there.  Except for Mr. Waterstreet's

8   argument that isn't buttressed by fact, we don't have any

9   family or extended family that's there.  There's no showing

10  that he's in communication with those people; that he stay --

11  that he's doing any of that.

12          Even on the tapes, it doesn't indicate, you know, I've

13  got all this family back there.  Again, there's, there's banter

14  that's going back and forth.  But where is the cold hard

15  reality?

16          Both sisters indicated the family came here.  And if

17  it wasn't for the fact that he couldn't get a waiver back in

18  the day, he would be a citizen here.

19          THE COURT:  Thank you.

20          MR. WEISS:  Hopefully, I've answered the Court's

21  question.

22          THE COURT:  You have.  Thank you.

23          MR. WATERSTREET:  Your Honor, may I respond?

24          THE COURT:  You may.

25          MR. WATERSTREET:  Thank you, very much.

1          Mr. Weiss posed some questions and I'm hoping I can

2     answer the Court.  Is it a violation to use marijuana when you

3     have a medical marijuana card?  I don't imagine that is a

4     violation of probation to use it.  But I still think it's a

5     crime to be under the influence and drive.  So that would be a

6     violation.  And --

7          MR. WEISS:  Defer this to the Dearborn Heights court.

8          THE COURT:  That's fine.  And I got to tell you,

9     whether or not he's smoking marijuana and drove, that's not the

10    alpha issue here.

11         MR. WATERSTREET:  Right.  It's not the obvious issue.

12    It's whether he's willing to follow the, the dictates of the

13    Court.

14         THE COURT:  I understand.

15         MR. WATERSTREET:  The issue about, you know, why would

16    he pay his taxes if he wasn't going to return.  Well, the last

17    closing I went to, the closing company takes that money, and

18    the Government is the first one to get that money before you

19    get your closing check.  So it's not as if he was given the

20    money and then he went and paid.  It was part of the closing

21    process.

22         And, you know, one reason to travel.  Well, frankly,

23    your Honor, he wouldn't have been given permission to travel

24    outside the United States by the court, I opine, if, as Mr.

25    Weiss pointed out he told them I'm going to join Hizballah.  He

1    had to show a roundtrip ticket.  So the fact that he has a

2    roundtrip ticket is, is not necessarily proof that he's going

3    to return.  It's to be able to get the permission and not to

4    have a warrant issued for him prior to his travel.

5           Then, as to family, family back there, Judge, I can, I

6    can only refer to the transcript.  And Mr. Weiss says, you

7    know, the Government has no proof whatsoever.  He's presented

8    absolutely nothing.

9           It's the defendant's words.  I have my uncle's family.

10   I have the whole world over there.  I have more people than

11   here, back, basically back in Lebanon who, who can -- I can go

12   to.  And if the Court reads through the transcripts, you will

13   see his reference to meeting up with his uncles and, and his

14   family.

15          And the last thing, Mr. Weiss, I appreciate his

16   advocacy, but I think he went a couple steps too far when he

17   says the defendant, there is no way he's ever said I'm going to

18   go there to fight.  I have the transcript:

19          "What do you mean, go there?

20          The defendant:  Go there to fight.  You will get paid

21   500 to a thousand while you're fighting.

22          From the party, the party of Hizballah?

23          Yes."

24          That's the defendant's own statements, Judge.  He does

25   emphatically say I'm going there to fight and I'm going to go

```
 1   fight for the party and the party is going to pay for me.
 2          MR. WEISS:  That's not accurate, your Honor.
 3          THE COURT:  Hang on one second.
 4          MR. WATERSTREET:  Thank you, your Honor.
 5          THE COURT:  I'll, I'll read the transcript.
 6          MR. WEISS:  Thank you.
 7          THE COURT:  And it will make it clear.
 8          Okay.  Thank you.  It's been a lengthy hearing.  It's
 9   a lot of material I want to review, because as always, I want
10   to make a completely informed decision, whatever that decision
11   is.  And I do want to review the transcripts as well.
12          I will continue this hearing to Thursday, March 27th,
13   day after tomorrow, one o'clock p.m.  I won't be here tomorrow.
14          MR. WEISS:  May I look at --
15          THE COURT:  You may.
16          MR. WEISS:  Your Honor, may counsel approach?
17          THE COURT:  Sure.
18          (Discussion off the record, 3:08 p.m. - 3:14 p.m.)
19          THE COURT:  All right.  I'm going to take this matter
20   under advisement.  I'll issue a decision on --
21          MR. WEISS:  Thank you, your Honor.
22          THE COURT:  -- Monday, March 31st, one o'clock p.m.
23          Mr. Hamdan will remain temporarily detained until that
24   time.
25          Now, let's take a break.
```

1          THE CLERK:  Court is in recess until 3:25.

2

3          (Proceedings adjourned at 3:14 p.m.)

4                      *       *       *

5

6                  **CERTIFICATE OF REPORTER**

7          As an official court reporter for the United States

8    District Court, appointed pursuant to provisions of Title 28,

9    United States Code, Section 753, I do hereby certify that the

10   foregoing is a correct transcript of the proceedings in the

11   above-entitled cause on the date hereinbefore set forth.

12

13

14               __s/ Christin E. Russell__

15            CHRISTIN E. RUSSELL, RMR, CRR, FCRR, RMR

16              Federal Official Court Reporter

17

18

19

20

21

22

23

24

25